# HAIG, SECRETARY OF STATE *v.* AGEE

No. 80–83. Argued January 14, 1981—Decided June 29, 1981

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 310. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 310.

*Solicitor General McCree* argued the cause for petitioner. With him on the briefs were *Assistant Attorney General Daniel, Deputy Solicitor General Geller, Andrew J. Levander, Leonard Schaitman, Michael F. Hertz,* and *William T. Lake.*

*Melvin L. Wulf* argued the cause and filed a brief for respondent.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether the President, acting through the Secretary of State, has authority to revoke a passport on the ground that the holder's activities in foreign countries are causing or are likely to cause serious damage to the national security or foreign policy of the United States.

I

A

Philip Agee, an American citizen, currently resides in West Germany.[1] From 1957 to 1968, he was employed by the Central Intelligence Agency. He held key positions in the division of the Agency that is responsible for covert intelligence gathering in foreign countries. In the course of his duties at the Agency, Agee received training in clandestine operations, including the methods used to protect the identities of intelligence employees and sources of the United States overseas. He served in undercover assignments abroad and came to know many Government employees and other persons supplying information to the United States. The relationships of many of these people to our Government are highly confidential; many are still engaged in intelligence gathering.

In 1974, Agee called a press conference in London to announce his "campaign to fight the United States CIA wherever it is operating." He declared his intent "to expose CIA officers and agents and to take the measures necessary to drive them out of the countries where they are operating." [2]

---

[1] Agee has been deported from Great Britain, France, and the Netherlands. Dirty Work: The CIA in Western Europe 286–300 (P. Agee & L. Wolf eds. 1978).

[2] The 1974 London statement was as follows:

"Today, I announced a new campaign to fight the United States CIA wherever it is operating. This campaign will have two main functions: First, to expose CIA officers and agents and to take the measures necessary to drive them out of the countries where they are operating; secondly, to seek within the United States to have the CIA abolished.

"The effort to identify CIA people in foreign countries has been going on for some time. . . . (Today's) list was compiled by a small group of Mexican comrades whom I trained to follow the comings and goings of CIA people before I left Mexico City.

"Similar lists of CIA people in other countries are already being com-

284

Since 1974, Agee has, by his own assertion, devoted consistent effort to that program, and he has traveled extensively in other countries in order to carry it out. To identify CIA personnel in a particular country, Agee goes to the target country and consults sources in local diplomatic circles whom he knows from his prior service in the United States Government. He recruits collaborators and trains them in clandestine techniques designed to expose the "cover" of CIA employees and sources. Agee and his collaborators have repeatedly and publicly identified individuals and organizations located in foreign countries as undercover CIA agents, employees, or sources.[3] The record reveals that the identifications divulge classified information,[4] violate Agee's express contract not to make any public statements about Agency matters without prior clearance by the Agency,[5] have prej-

---

piled and will be announced when appropriate. We invite participation in this campaign from all those who strive for social justice and national dignity." App. to Pet. for Cert. 107a.

See also P. Agee, Exposing the CIA, App. in No. 80–1125 (CADC), pp. 76–79 (hereinafter CA App.).

[3] In a series of incidents between 1974 and 1978, and in two books published in the same period, Agee has identified hundreds of persons as CIA personnel. See App. to Pet. for Cert. 108a–111a; see generally P. Agee, Inside the Company: CIA Diary (1975); Dirty Work: The CIA in Western Europe 17–43 (P. Agee & L. Wolf eds. 1978), CA App. 66–79. See also P. Agee, Introduction, in Dirty Work 2: The CIA in Africa (E. Ray, W. Schapp, K. Van Meter, & L. Wolf eds. 1979). The latter two books contain "Who's Where" sections listing the names of alleged CIA employees on a country-by-country basis and "Who's Who" sections containing detailed biographical information on all such persons.

[4] See Affidavits of CIA Deputy Director for Operations, App. to Pet. for Cert. 112a, 114a; see also n. 5, infra.

[5] As a condition for his employment by the Agency, Agee contracted that "[i]n consideration of my employment by CIA I undertake not to publish or to participate in the publication of any information or material relating to the Agency, its activities or intelligence activities generally,

udiced the ability of the United States to obtain intelligence,[6] and have been followed by episodes of violence against the persons and organizations identified.[7]

---

either during or after the term of my employment by the Agency without specific prior approval by the Agency." CA App. 65.

This language is identical to the clause which we construed in *Snepp* v. *United States*, 444 U. S. 507, 508 (1980).

In a separate lawsuit wherein the Government sought to enforce Agee's agreement, the District Court held that "Agee has shown a flagrant disregard for the requirements of the Secrecy Agreement." The court noted: "There is no dispute that Agee has openly flouted his refusal to submit writings and speeches to the CIA for prior approval, and has expressed a clear intention to reveal classified information and bring harm to the agency and its personnel." *Agee* v. *Central Intelligence Agency*, 500 F. Supp. 506, 509 (DC 1980) (footnote omitted).

[6] Affidavit of CIA Deputy Director for Operations, App. to Pet. for Cert. 112a.

[7] In December 1975, Richard Welch was murdered in Greece after the publication of an article in an English-language newspaper in Athens naming Welch as CIA Chief of Station. CA App. 92. In July 1980, two days after a Jamaica press conference at which Agee's principal collaborator identified Richard Kinsman as CIA Chief of Station in Jamaica, Kinsman's house was strafed with automatic gunfire. Four days after the same press conference, three men approached the Jamacia home of another man similarly identified as an Agency officer. Police challenged the men and gunfire was exchanged. Affidavit of United States Ambassador to Jamaica, App. to Pet. for Cert. 125a–127a. In January 1981, two American officials of the American Institute for Free Labor Development, previously identified as a CIA front by Agee and discussed extensively in Agee's book Inside the Company: CIA Diary, were assassinated in El Salvador. N. Y. Times, Jan. 15, 1981, p. A10, cols. 4–5; *id.*, Jan. 5, 1981, p. A1, col. 6, p. A10, cols. 3–6.

The Secretary does not assert that Agee has specifically incited anyone to commit murder. However, affidavits of the CIA's Deputy Director for Operations set out and support his judgment that Agee's purported identifications are "thinly-veiled invitations to violence," that "Agee's actions could, in today's circumstances, result in someone's death," and that Agee's conduct has "markedly increased the likelihood of individuals so identified being the victims of violence." App. to Pet. for Cert. 111a, 116a–118a. One of those affidavits also shows that the ultimate effectiveness of Agee's program depends on activities of hostile foreign

In December 1979, the Secretary of State revoked Agee's passport and delivered an explanatory notice to Agee in West Germany. The notice states in part:

"The Department's action is predicated upon a determination made by the Secretary under the provisions of [22 CFR] Section 51.70 (b)(4) that your activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States. The reasons for the Secretary's determination are, in summary, as follows: Since the early 1970's it has been your stated intention to conduct a continuous campaign to disrupt the intelligence operations of the United States. In carrying out that campaign you have travelled in various countries (including, among others, Mexico, the United Kingdom, Denmark, Jamaica, Cuba, and Germany), and your activities in those countries have caused serious damage to the national security and foreign policy of the United States. Your stated intention to continue such activities threatens additional damage of the same kind." [8]

groups, and that such groups can be expected to engage in physical surveillance, harassment, kidnaping, and, in extreme cases, murder of United States officials abroad. *Id.,* at 116a–117a.

[8] *Id.,* at 120a. Both the District Court and the Court of Appeals suggested that the immediate impetus for the passport revocation may have been that Agee's activities took on special significance in light of the crisis following the seizure of the American Embassy in Iran on November 4, 1979. *Agee* v. *Vance,* 483 F. Supp. 729 (DC 1980); *Agee* v. *Muskie,* 203 U. S. App. D. C. 46, 47, 629 F. 2d 80, 81 (1980). The captors held more than 50 United States citizens, many of whom were diplomats and some of whom the captors alleged to be CIA agents. Government affidavits show that Agee made contact with the captors, urged them to demand certain CIA documents, and offered to travel to Iran to analyze the documents. App. to Pet. for Cert. 117a; N. Y. Times, Dec. 24, 1979, p. 6, col. 5. A Government affidavit also mentions, but does not vouch for the accuracy of, an earlier report that Agee had been invited to travel to Iran in order to participate in a "Revolutionary Tribunal" to pass judgment on those hostages. App. to Pet. for Cert. 116a–117a.

The notice also advised Agee of his right to an administrative hearing [9] and offered to hold such a hearing in West Germany on 5 days' notice.

Agee at once filed suit against the Secretary.[10] He alleged that the regulation invoked by the Secretary, 22 CFR § 51.70 (b)(4) (1980), has not been authorized by Congress and is invalid; that the regulation is impermissibly overbroad; that the revocation prior to a hearing violated his Fifth Amendment right to procedural due process; and that the revocation violated a Fifth Amendment liberty interest in a right to travel and a First Amendment right to criticize Government policies. He sought declaratory and injunctive relief, and he moved for summary judgment on the question of the authority to promulgate the regulation and on the constitutional claims. For purposes of that motion, Agee conceded the Secretary's factual averments [11] and his claim that Agee's activities were causing or were likely to cause serious damage to the national security or foreign policy of the United States.[12] The District Court held that the regulation exceeded the statutory powers of the Secretary under the Passport Act of 1926, 22 U. S. C. § 211a,[13] granted summary

---

[9] See 22 CFR §§ 51.80–51.89 (1980).

[10] Agee made no effort to exhaust administrative remedies. The Secretary initially defended on this ground. Tr. 5–6 (Jan. 3, 1980). However, after Agee conceded that his activities are causing or are likely to cause serious damage to the national security (see n. 11, *infra*), the Secretary did not continue to rely on failure to exhaust available administrative remedies. Tr. 17 (Jan. 3, 1980).

[11] Agee's counsel certified that "[t]here aren't any factual disputes in the case" and stated that for the purposes of the motion "I would concede any charge [the Government] want[s] to make against him." *Id.*, at 2, 13. See also Secretary's Statement of Undisputed Material Facts, CA App. 35. The Secretary made clear that the Government's affidavits were "an effort to establish the kinds of things which would have been established through the administrative process if Mr. Agee had proceeded in that direction . . . ." Tr. 8 (Jan. 29, 1980).

[12] 483 F. Supp., at 730.

[13] This statute is set out *infra*, at 290.

judgment for Agee, and ordered the Secretary to restore his passport. *Agee* v. *Vance*, 483 F. Supp. 729 (DC 1980).

## B

A divided panel of the Court of Appeals affirmed. *Agee* v. *Muskie*, 203 U. S. App. D. C. 46, 629 F. 2d 80 (1980). It held that the Secretary was required to show that Congress had authorized the regulation either by an express delegation or by implied approval of a "substantial and consistent" administrative practice, *Zemel* v. *Rusk*, 381 U. S. 1, 12 (1965). The court found no express statutory authority for the revocation. It perceived only one other case of actual passport revocation under the regulation since it was promulgated and only five other instances prior to that in which passports were actually denied "even arguably for national security or foreign policy reasons." 203 U. S. App. D. C., at 51–52, 629 F. 2d, at 85–86. The Court of Appeals took note of the Secretary's reliance on "a series of statutes, regulations, proclamations, orders and advisory opinions dating back to 1856," but declined to consider those authorities, reasoning that "the criterion for establishing congressional assent by inaction is the actual imposition of sanctions and not the mere assertion of power." *Id.*, at 52–53, 629 F. 2d, at 86–87. The Court of Appeals held that its was not sufficient that "Agee's conduct may be considered by some to border on treason," since "[w]e are bound by the law as we find it." *Id.*, at 53, 629 F. 2d, at 87. The court also regarded it as material that most of the Secretary's authorities dealt with powers of the Executive Branch "during time of war or national emergency" [14]

---

[14] On November 14, 1979, in response to the seizure of the American Embassy in Iran (n. 8, *supra*), President Carter declared a national emergency. Exec. Order No. 12170, 3 CFR 457 (1980). The President's Order contains an express finding, pursuant to the International Emergency Economic Powers Act, 50 U. S. C. §§ 1701–1706 (1976 ed., Supp. III), "that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States." The

or with respect to persons "engaged in criminal conduct."[15] *Id.*, at 52, 629 F. 2d, at 86.

We granted certiorari *sub nom. Muskie* v. *Agee,* 449 U. S. 818 (1980), and stayed the judgment of the Court of Appeals until our disposition of the case on the grant of certiorari.[16]

## II

The principal question before us is whether the statute authorizes the action of the Secretary pursuant to the policy announced by the challenged regulation.[17]

### A

#### 1

Although the historical background that we develop later

---

Secretary has never relied upon that Order to justify the passport revocation in the present case. General restrictions on travel to Iran under American passports apparently did not go into effect until several months after Agee's passport was revoked. See Exec. Order No. 12211, 3 CFR 253 (1980). Accordingly, our decision in this case does not depend on the declaration of national emergency.

[15] The Court of Appeals stressed that Agee had not been indicted. In dicta, the court expressed approval of 22 CFR § 51.70 (a) (1) (1980), which provides for withholding of a passport if the applicant is the subject of an outstanding federal felony warrant. 203 U. S. App. D. C., at 53, n. 10, 629 F. 2d, at 87, n. 10, citing *Kent* v. *Dulles,* 357 U. S. 116, 127–128 (1958).

[16] The Secretary represents that Agee's passport has been canceled and that the Secretary has provided Agee with identification papers permitting him to return to the United States. Tr. of Oral Arg. 11. The regulations at issue contain an exception for "direct return to the United States." 22 CFR § 51.70 (a) (1980).

[17] In light of our decision on this issue, we have no occasion in this case to determine the scope of "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." See *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 319–320 (1936).

is important, we begin with the language of the statute. See, *e. g., Universities Research Assn. v. Coutu,* 450 U. S. 754, 771 (1981); *Zemel, supra,* at 7–8. The Passport Act of 1926 provides in pertinent part:

> "The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic representatives of the United States . . . under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports." 22 U. S. C. § 211a (1976 ed., Supp. IV).

This language is unchanged since its original enactment in 1926.[18]

The Passport Act does not in so many words confer upon the Secretary a power to revoke a passport. Nor, for that matter, does it expressly authorize denials of passport applications.[19] Neither, however, does any statute expressly limit those powers. It is beyond dispute that the Secretary has the power to deny a passport for reasons not specified in the statutes. For example, in *Kent* v. *Dulles,* 357 U. S. 116 (1958), the Court recognized congressional acquiescence in Executive policies of refusing passports to applicants "participating in illegal conduct, trying to escape the toils of the law, promoting passport frauds, or otherwise engaging in conduct which would violate the laws of the United States." *Id.,* at 127. In *Zemel,* the Court held that "the weightiest

---

[18] In fact, the pertinent language has not been changed since 1874. See n. 26, *infra.* The sole amendment to the 1926 provision, enacted in 1978, limits the power of the Executive to impose geographic restrictions on the use of United States passports in the absence of war, armed hostilities, or imminent danger to travelers. See *infra,* at 300, and n. 48.

[19] However, by statute originally enacted in 1856, passports may not be issued to persons who do not owe allegiance to the United States. 22 U. S. C. § 212; *Kent, supra,* at 127. This provision in no way diminishes the Secretary's discretion as to eligible persons.

considerations of national security" authorized the Secretary to restrict travel to Cuba at the time of the Cuban missile crisis. 381 U. S., at 16. Agee concedes that if the Secretary may deny a passport application for a certain reason, he may revoke a passport on the same ground.[20]

## 2

Particularly in light of the "broad rule-making authority granted in the [1926] Act," *Zemel*, 381 U. S., at 12, a consistent administrative construction of that statute must be followed by the courts " 'unless there are compelling indications that it is wrong.' " *E. I. du Pont de Nemours & Co.* v. *Collins*, 432 U. S. 46, 55 (1977), quoting *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 381 (1969); see *Zemel, supra,* at 11. This is especially so in the areas of foreign policy and national security, where congressional silence is not to be equated with congressional disapproval.[21] In *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304 (1936), the volatile nature of problems confronting the Executive in foreign policy and national defense was underscored:

> "In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. . . . As Marshall said in his great argument of March 7, 1800, in the House of Representatives, 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' " *Id.,* at 319.

---

[20] Tr. of Oral Arg. 33. That has been the Secretary's consistent construction of the statute. See 22 CFR § 51.71 (a) (1980), which provides, *inter alia,* that the grounds for denying passports set out in § 51.70 are also grounds for revoking, restricting, or limiting passports.

[21] This case does not involve a criminal prosecution; accordingly, strict construction against the Government is not required.

Applying these considerations to statutory construction, the *Zemel* Court observed:

"[B]ecause of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature, *Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas.*" 381 U. S., at 17 (emphasis supplied).

Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention. In *Harisiades* v. *Shaughnessy,* 342 U. S. 580 (1952), the Court observed that matters relating "to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.,* at 589; accord, *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.,* 333 U. S. 103, 111 (1948).

## B

### 1

A passport is, in a sense, a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer. 3 G. Hackworth, Digest of International Law § 268, p. 499 (1942). Very early, the Court observed:

"[A passport] is a document, which, from its nature and object, is addressed to foreign powers; purporting only to be a request, that the bearer of it may pass safely and freely; and is to be considered rather in the character of a political document, by which the bearer is recognised, in foreign countries, as an American citizen; and

which, by usage and the law of nations, is received as evidence of the fact." *Urtetiqui* v. *D'Arcy,* 9 Pet. 692, 698 (1835).

With the enactment of travel control legislation making a passport generally a requirement for travel abroad,[22] a passport took on certain added characteristics. Most important for present purposes, the only means by which an American can lawfully leave the country or return to it—absent a Presidentially granted exception—is with a passport. See 8 U. S. C. § 1185 (b) (1976 ed., Supp. IV). As a travel control document, a passport is both proof of identity and proof of allegiance to the United States. Even under a travel control statute, however, a passport remains in a sense a document by which the Government vouches for the bearer and for his conduct.

The history of passport controls since the earliest days of the Republic shows congressional recognition of Executive authority to withhold passports on the basis of substantial reasons of national security and foreign policy. Prior to 1856, when there was no statute on the subject, the common perception was that the issuance of a passport was committed to the sole discretion of the Executive and that the Executive would exercise this power in the interests of the national security and foreign policy of the United States.[23] This derived from the generally accepted view that foreign policy

---

[22] With exceptions during the War of 1812 and the Civil War, see *infra,* at 294, n. 25, and 295, passports were not mandatory until 1918. See *infra,* at 296–297. It was not until 1978 that passports were required by statute in nonemergency peacetime. See n. 47, *infra.*

[23] In *Urtetiqui* v. *D'Arcy,* 9 Pet. 692, 699 (1835), the Court observed: "There is no law of the United States, in any manner regulating the issuing of passports, or directing upon what evidence it may be done, or declaring their legal effect. It is understood, as matter of practice, that some evidence of citizenship is required, by the Secretary of State, before issuing a passport. This, however, is entirely discretionary with him."

was the province and responsibility of the Executive.[24] From the outset, Congress endorsed not only the underlying premise of Executive authority in the areas of foreign policy and national security, but also its specific application to the subject of passports. Early Congresses enacted statutes expressly recognizing the Executive authority with respect to passports.[25]

The first Passport Act, adopted in 1856, provided that the Secretary of State "shall be authorized to grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States . . . ." § 23, 11 Stat. 60.[26] This broad and permissive language worked no change in the power of the Executive to issue passports; nor was it intended to do so. The Act was passed to centralize passport authority in the Federal Government [27] and specifically in the Secretary of State.[28] In all other respects, the 1856 Act

"merely confirmed an authority already possessed and

---

[24] See, e. g., *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S., at 320–321; The Federalist No. 64, pp. 392–396 (Mentor ed. 1961).

[25] For example, the Act of Feb. 26, 1803, ch. 9, § 8, 2 Stat. 205, prohibited State Department representatives abroad from knowingly issuing passports to aliens, and the Act of Feb. 4, 1815, ch. 31, § 10, 3 Stat. 199, prohibited travel to or from enemy territory "without a passport first obtained from the Secretary of State, the Secretary of War, or other officer . . . authorized by the President of the United States, to grant the same."

[26] An 1874 amendment replaced the phrase "shall be authorized to" with "may." Rev. Stat. § 4075. We are aware of no legislative history pertinent to that change. To the extent that amendment is relevant, it supports the Secretary's position in this case; "may" expressly recognizes substantial discretion. See 23 Op. Atty. Gen. 509, 511 (1901).

[27] The main impetus for the 1856 statute was the confusion caused by state and local officials issuing passports, a relic of the colonial period. See U. S. Dept. of State, The American Passport 36–42 (1898).

[28] Senator Mason, sponsor of the bill that became the 1856 statute, stated: "[I]t was the intention of the bill to leave all that pertains to the diplomatic service of the country . . . exclusively to the Executive, where

exercised by the Secretary of State. This authority was ancillary to his broader authority to protect American citizens in foreign countries and was necessarily incident to his general authority to conduct the foreign affairs of the United States under the Chief Executive." Senate Committee on Government Operations, Reorganization of the Passport Functions of the Department of State, 86th Cong., 2d Sess., 13 (Comm. Print 1960).

The President and the Secretary of State consistently construed the 1856 Act to preserve their authority to withhold passports on national security and foreign policy grounds. Thus, as an emergency measure in 1861, the Secretary issued orders prohibiting persons from going abroad or entering the country without passports; denying passports to citizens who were subject to military service unless they were bonded; and absolutely denying passports to persons "on errands hostile and injurious to the peace of the country and dangerous to the Union." 3 J. Moore, A Digest of International Law 920 (1906); U. S. Dept. of State, The American Passport 49–54 (1898).[29] An 1869 opinion of Attorney General Hoar held that the granting of a passport was not "obligatory in any case." 13 Op. Atty. Gen. 89, 92. This was elaborated in 1901 in an opinion of Attorney General Knox, in which he stated:

> "Substantial reasons exist for the use by Congress of the word 'may' in connection with authority to issue passports. Circumstances are conceivable which would make it most inexpedient for the public interests for this

---

we consider the Constitution has placed it." Cong. Globe, 34th Cong., 1st Sess., 1798 (1856).

[29] Despite this widely publicized Executive policy restricting passport eligibility on national security grounds, the only congressional action arguably in response to it was a statute in 1866 which re-enacted an 1856 prohibition against issuing passports to noncitizens. Act of May 30, 1866, ch. 102, 14 Stat. 54.

country to grant a passport to a citizen of the United States." 23 Op. Atty. Gen. 509, 511.

In 1903, President Theodore Roosevelt promulgated a rule providing that "[t]he Secretary of State has the right in his discretion to refuse to issue a passport, and will exercise this right towards anyone who, he has reason to believe, desires a passport to further an unlawful or improper purpose." [30] Subsequent Executive Orders issued between 1907 and 1917 cast no doubt on this position.[31] This policy was enforced in peacetime years to deny passports to citizens whose conduct abroad was "likely to embarrass the United States" [32] or who were "disturbing, or endeavoring to disturb, the relations of this country with the representatives of foreign countries." [33]

By enactment of the first travel control statute in 1918,[34]

---

[30] Rules Governing the Granting and Issuing of Passports in the United States, Sept. 12, 1903, § 16, quoted in 3 J. Moore, A Digest of International Law 902 (1906).

[31] See Exec. Order No. 654 (1907); Exec. Order No. 2119–A (1915); Exec. Order No. 2362–A (1916); Exec. Order No. 2519–A (1917).

[32] 3 G. Hackworth, Digest of International Law § 268, pp. 498–499 (1942), discussing refusal of a passport to an American citizen residing in China whose promotion of "gambling and immoral houses" had developed into a scandal.

[33] 2 Papers Relating to Foreign Relations of the United States—1907, p. 1082, discussing refusal of a passport to an American citizen residing in Egypt who was slandering foreign diplomats.

[34] Act of May 22, 1918, ch. 81, §§ 1–2, 40 Stat. 559. This statute provided in pertinent part that, upon Presidential wartime proclamation, "it shall, except as otherwise provided by the President and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter or attempt to depart from or enter the United States unless he bears a valid passport."

Unlike the 1815 statute, n. 25, *supra,* which was limited in application to the then-current hostilities, the 1918 Act applied "when the United States is at war" and the President issued a proclamation. § 1, 40 Stat. 559.

Congress made clear its expectation that the Executive would curtail or prevent international travel by American citizens if it was contrary to the national security. The legislative history reveals that the principal reason for the 1918 statute was fear that "renegade Americans" would travel abroad and engage in "transference of important military information" to persons not entitled to it.[35] The 1918 statute left the power to make exceptions exclusively in the hands of the Executive, without articulating specific standards. Unless the Secretary had power to apply national security criteria in passport decisions, the purpose of the Travel Control Act would plainly have been frustrated.

Against this background, and while the 1918 provisions were still in effect, Congress enacted the Passport Act of 1926. The legislative history of the statute is sparse. However, Congress used language which is identical in pertinent part to that in the 1856 statute (*supra*, at 294), as amended,[36] and the legislative history clearly shows congressional awareness of the Executive policy.[37] There is no evidence of any intent to repudiate the longstanding administrative construction.[38] Absent such evidence, we conclude that Congress, in

---

[35] H. R. Rep. No. 485, 65th Cong., 2d Sess., 2 (1918). Congress focused on the case of "a United States citizen who recently returned from Europe after having, to the knowledge of our Government, done work in a neutral country for the German Government. There was strong suspicion that he came to the United States for no proper purpose. Nevertheless not only was it impossible to exclude him but it would now be impossible to prevent him from leaving the country if he saw fit to do so. The known facts in his case are not sufficient to warrant the institution of a criminal prosecution, and in any event the difficulty of securing legal evidence from the place of his activities in Europe may easily be imagined." *Id.*, at 3.

[36] See n. 26, *supra*.

[37] See Validity of Passports: Hearings on H. R. 11947 before the House Committee on Foreign Affairs, 69th Cong., 1st Sess., 5, 8, 10–11 (1926) (1926 Hearings).

[38] Besides incorporating the 1856 provision, the 1926 Act added other provisions concerning fees and maximum terms for passports. See *id.*, at

1926, adopted the longstanding administrative construction of the 1856 statute. See *Lorillard* v. *Pons,* 434 U. S. 575, 580–581 (1978).

The Executive construed the 1926 Act to work no change in prior practice and specifically interpreted it to authorize denial of a passport on grounds of national security or foreign policy. Indeed, by an unbroken line of Executive Orders,[39] regulations,[40] instructions to consular officials,[41] and notices to passport holders,[42] the President and the Department of State left no doubt that likelihood of damage to national security or foreign policy of the United States was the single most important criterion in passport decisions. The regulations are instructive. The 1952 version authorized denial of passports to citizens engaged in activities which would violate laws designed to protect the security of the United States "[i]n order to promote the national interest by assuring that the conduct of foreign relations shall be free

---

2. Assistant Secretary of State Carr, whom the House Committee regarded as "more familiar than anyone else with the entire subject," explained that the only change in existing law worked by the pertinent section of the 1926 Act was to recognize authority of the Secretary of State to empower consuls, in addition to diplomatic officers, to issue passports in foreign countries. *Id.,* at 1, 11.

[39] See Exec. Order No. 4800 (1928); Exec. Order No. 5860 (1932); Exec. Order No. 7856, 3 Fed. Reg. 681 (1938).

[40] See 6 Fed. Reg. 5821, 6069–6070, 6349 (1941); 17 Fed. Reg. 8013 (1952); 22 CFR § 51.136 (1958).

[41] See, *e. g.,* U. S. Dept. of State, Abstract of Passport Laws and Precedents, Passport Office Instructions, Code No. 7.21 (Nov. 1, 1955), excluding "[p]ersons whose travel would . . . be inimical to the best interests of the United States," and "[p]ersons whose travel would endanger the security of the United States."

[42] From 1948 to 1955, the Department notified all bearers of passports that "interfere[nce] in the political affairs of foreign countries" would be taken as a ground for refusing passports and for refusing protection. U. S. Dept. of State, Information for Bearers of Passports (Jan. 1, 1948, through Jan. 15, 1955, eds.).

from unlawful interference." 17 Fed. Reg. 8013 (1952). The 1956 amendment to this regulation provided that a passport should be denied to any person whose

"activities abroad would: (a) Violate the laws of the United States; (b) be prejudicial to the orderly conduct of foreign relations; or (c) otherwise be prejudicial to the interests of the United States." 22 CFR § 51.136 (1958).

This regulation remained in effect continuously until 1966.

This history of administrative construction was repeatedly communicated to Congress, not only by routine promulgation of Executive Orders and regulations, but also by specific presentations, including 1957 and 1966 reports by the Department of State explaining the 1956 regulation[43] and a 1960 Senate Staff Report which concluded that "the authority to issue or withhold passports has, by precedent and law, been vested in the Secretary of State as a part of his responsibility to protect American citizens traveling abroad, and what he considered to be the best interests of the Nation."[44]

In 1966, the Secretary of State[45] promulgated the regulations at issue in this case. 22 CFR §§ 51.70 (b)(4), 51.71 (a) (1980). Closely paralleling the 1956 regulation, these provisions authorize revocation of a passport where "[t]he Secretary determines that the national's activities abroad are

---

[43] See Hearing on Right to Travel before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 85th Cong., 1st Sess., pt. 2, pp. 59–61 (1957); Proposed Travel Controls, Hearings on S. 3243 before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., 72 (1966).

[44] Senate Committee on Government Operations, Reorganization of the Passport Functions of the Department of State, 86th Cong., 2d Sess., 13 (Comm. Print 1960).

[45] Pursuant to the general delegation statute, 3 U. S. C. § 301, the power of the President to prescribe passport regulations has been delegated to the Secretary. Exec. Order No. 11295, 3 CFR 570 (1966–1970 Comp.).

causing or are likely to cause serious damage to the national security or the foreign policy of the United States." [46]

## 2

*Zemel* recognized that congressional acquiescence may sometimes be found from nothing more than silence in the face of an administrative policy. 381 U. S., at 11; see *Udall* v. *Tallman,* 380 U. S. 1, 16–18 (1965); *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294, 313 (1933); *Costanzo* v. *Tillinghast,* 287 U. S. 341, 345 (1932). Here, however, the inference of congressional approval "is supported by more than mere congressional inaction." *Zemel,* 381 U. S., at 11–12. Twelve years after the promulgation of the regulations at issue and 22 years after promulgation of the similar 1956 regulation, Congress enacted the statute making it unlawful to travel abroad without a passport even in peacetime. 8 U. S. C. § 1185 (b) (1976 ed., Supp. IV). [47] Simultaneously, Congress amended the Passport Act of 1926 to provide that "[u]nless authorized by law," in the absence of war, armed hostilities, or imminent danger to travelers, a passport may not be geographically restricted. [48] Title 8 U. S. C. § 1185 (b) (1976 ed., Supp. IV) must be read *in pari materia* with the

---

[46] Section 51.70 (b) (4) authorizes denial of a passport for this reason. Section 51.71 (a), setting out grounds for revoking, restricting, or limiting passports, incorporates § 51.70 by reference. There have been no pertinent changes in these regulations since 1966.

[47] Act of Oct. 7, 1978, § 707 (b), 92 Stat. 993. This statute provides:

"Except as otherwise provided by the President and subject to such limitations and exceptions as the President may authorize and prescribe, it shall be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

This provision amended § 215 of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1185. Under the 1952 version, passports were required only in wartime or when the President had declared an emergency.

[48] Act of Oct. 7, 1978, § 124, 92 Stat. 971, 22 U. S. C. § 211a (1976 ed.,

Passport Act. *Zemel, supra,* at 11–12; see 2A C. Sands, Sutherland on Statutory Construction § 51.03, p. 299 (4th ed. 1973); cf. *Erlenbaugh* v. *United States,* 409 U. S. 239, 243–244 (1972).[49]

The 1978 amendments are weighty evidence of congressional approval of the Secretary's interpretation, particularly that in the 1966 regulations. Despite the longstanding and officially promulgated view that the Executive had the power to withhold passports for reasons of national security and foreign policy, Congress in 1978, "though it once again enacted legislation relating to passports, left completely untouched the broad rule-making authority granted in the earlier Act." *Zemel, supra,* at 12; accord, *NLRB* v. *Bell Aerospace Co.,* 416 U. S. 267, 274–275 (1974).[50]

### 3

Agee argues that the only way the Executive can establish implicit congressional approval is by proof of longstanding and consistent *enforcement* of the claimed power: that is, by showing that many passports were revoked on national

---

Supp. IV). This amendment added the following language to the Passport Act:

"Unless authorized by law, a passport may not be designated as restricted for travel to or for use in any country other than a country with which the United States is at war, where armed hostilities are in progress, or where there is imminent danger to the public health or the physical safety of United States travellers."

The statute provides that the purpose of this amendment is "achieving greater United States compliance with the provisions of the Final Act of the Conference on Security and Cooperation in Europe (signed at Helsinki on August 1, 1975)." 92 Stat. 971.

[49] See also S. Rep. No. 94–1168, pp. 32–33 (1976).

[50] Indeed, the inference of congressional approval is stronger here than in *Zemel,* where the Court relied on amendments to the Travel Control Act. 381 U. S., at 11–12. Here, the amendment was to the Passport Act itself. Congress is therefore presumed to have adopted the administrative construction. *Lorillard* v. *Pons,* 434 U. S. 575, 580 (1978).

security and foreign policy grounds. For this proposition, he relies on *Kent,* 357 U. S., at 127–128.[51]

A necessary premise for Agee's contention is that there were frequent occasions for revocation and that the claimed Executive power was exercised in only a few of those cases. However, if there were no occasions—or few—to call the Secretary's authority into play, the absence of frequent instances of enforcement is wholly irrelevant. The exercise of a power emerges only in relation to a factual situation, and the continued validity of the power is not diluted simply because there is no need to use it.

The history is clear that there have been few situations involving substantial likelihood of serious damage to the national security or foreign policy of the United States as a result of a passport holder's activities abroad, and that in the cases which have arisen, the Secretary has consistently exercised his power to withhold passports. Perhaps the most notable example of enforcement of the administrative policy, which surely could not have escaped the attention of Congress, was the 1948 denial of a passport to a Member of Congress who sought to go abroad to support a movement in Greece to overthrow the existing government.[52] Another example was the 1954 revocation of a passport held by a man who was supplying arms to groups abroad whose interests were contrary to positions taken by the United States.[53] In 1970, the Secretary revoked passports of two persons who sought to travel to the site of an international airplane hijacking.[54] See also Note, 61 Yale L. J. 170, 174–176 (1952).

---

[51] The Court of Appeals accepted this argument. See 203 U. S. App. D. C., at 53, 629 F. 2d, at 87, quoted *supra,* at 288.

[52] See N. Y. Times, Apr. 11, 1948, p. E9.

[53] Brief for Petitioner 39; see Developments in the Law—The National Security Interest and Civil Liberties, 85 Harv. L. Rev. 1130, 1150–1151, n. 76 (1972).

[54] See *Sirhan* v. *Rogers,* No. 70 Civ. 3965 (SDNY, Sept. 11, 1970),

The Secretary has construed and applied his regulations consistently, and it would be anomalous to fault the Government because there were so few occasions to exercise the announced policy and practice. Although a pattern of actual enforcement is one indicator of Executive policy, it suffices that the Executive has "openly asserted" the power at issue. *Zemel,* 381 U. S., at 9; see *id.,* at 10.

*Kent* is not to the contrary. There, it was shown that the claimed governmental policy had not been enforced consistently. The Court stressed that "as respects Communists these are scattered rulings and not consistently of one pattern." 357 U. S., at 128. In other words, the Executive had allowed passports to some Communists, but sought to deny one to Kent. The Court had serious doubts as to whether there was in reality any definite policy in which Congress could have acquiesced. Here, by contrast, there is no basis for a claim that the Executive has failed to enforce the policy against others engaged in conduct likely to cause serious damage to our national security or foreign policy. It would turn *Kent* on its head to say that simply because we have had only a few situations involving conduct such as that in this record, the Executive lacks the authority to deal with the problem when it is encountered.[55]

Agee also contends that the statements of Executive policy are entitled to diminished weight because many of them concern the powers of the Executive in wartime. However, the statute provides no support for this argument. History eloquently attests that grave problems of national security and foreign policy are by no means limited to times of formally declared war.[56]

---

appeal dism'd, No. 35364 (CA2, Sept. 11, 1970) (denying plaintiff's request for injunctive relief).

[55] Congress considered, but did not enact, proposals to spell out passport standards in the 1926 Act. See 1926 Hearings, at 4–5.

[56] Congress itself has from time to time deemed it necessary to enact peacetime passport restrictions, and those measures recognize considerable

4

Relying on the statement of the Court in *Kent* that "illegal conduct" and problems of allegiance were, "so far as relevant here, . . . the only [grounds] which it could fairly be argued were adopted by Congress in light of prior administrative practice," *id.*, at 127–128, Agee argues that this enumeration was exclusive and is controlling here. This is not correct.

The *Kent* Court had no occasion to consider whether the Executive had the power to revoke the passport of an individual whose *conduct* is damaging the national security and foreign policy of the United States. *Kent* involved denials of passports solely on the basis of political beliefs entitled to First Amendment protection. See *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964). Although finding it unnecessary to reach the merits of that constitutional problem, the *Kent* Court emphasized the fact that "[w]e deal with *beliefs,* with *associations,* with *ideological* matters." 357 U. S., at 130 (emphasis supplied). In particular, the Court noted that the applicants were

> "being denied their freedom of movement solely because of their refusal to be subjected to inquiry into their beliefs and associations. They do not seek to escape the law nor to violate it. They may or may not be Communists. But assuming they are, the only law which Congress has passed expressly curtailing the movement of Communists across our borders has not yet become effective. It would therefore be strange to infer that pending the effectiveness of that law, the Secretary has been silently granted by Congress the larger, the more pervasive power to curtail in his discretion the free movement of citizens in order to satisfy himself about their beliefs or associations." *Ibid.* (footnote omitted).

discretion in the Executive. *E. g.,* Act of Oct. 7, 1978 (n. 47, *supra*); Act of May 30, 1866 (nn. 19, 29, *supra*).

The protection accorded beliefs standing alone is very different from the protection accorded conduct. Thus, in *Aptheker* v. *Secretary of State, supra,* the Court held that a statute which, like the policy at issue in *Kent,* denied passports to Communists solely on the basis of political beliefs unconstitutionally "establishes an irrebuttable presumption that individuals who are members of the specified organizations will, if given passports, engage in activities inimical to the security of the United States." 378 U. S., at 511. The Court recognized that the legitimacy of the objective of safeguarding our national security is "obvious and unarguable." *Id.,* at 509. The Court explained that the statute at issue was not the least restrictive alternative available: "The prohibition against travel is supported only by a tenuous relationship between the bare fact of organizational membership and the activity Congress sought to proscribe." *Id.,* at 514.

Beliefs and speech are only part of Agee's "campaign to fight the United States CIA." In that sense, this case contrasts markedly with the facts in *Kent* and *Aptheker.*[57] No presumptions, rebuttable or otherwise, are involved, for Agee's

---

[57] The same is true of *Dayton* v. *Dulles,* 357 U. S. 144 (1958), the companion case to *Kent.* In *Dayton,* the Secretary refused to issue a passport to a physicist who sought to go to India to engage in experimental research. The Secretary relied on the applicant's " 'connection with the Science for Victory Committee and his association at that time with various communists,' " and on his " 'association with persons suspected of being part of the Rosenberg espionage ring and his alleged presence at an apartment in New York which was allegedly used for microfilming material obtained for the use of a foreign government.' " *Id.,* at 146. Although reserving the question of "[w]hether there are undisclosed grounds adequate to sustain the Secretary's action," this Court held that the Secretary's "Decision and Findings" showed "only a denial of a passport for reasons which we have today held to be impermissible," citing *Kent.* 357 U. S., at 150. The "Decision and Findings," set out in the Appendix to the Court's opinion, *id.,* at 150–154, does not cite a single instance of Dayton's *conduct,* as distinguished from mere support for "the Communist movement" or association with known Communists.

conduct in foreign countries presents a serious danger to American officials abroad and serious danger to the national security.[58]

We hold that the policy announced in the challenged regulations is "sufficiently substantial and consistent" to compel the conclusion that Congress has approved it. See *Zemel,* 381 U. S., at 12.

### III

Agee also attacks the Secretary's action on three constitutional grounds: first, that the revocation of his passport impermissibly burdens his freedom to travel; second, that the action was intended to penalize his exercise of free speech and deter his criticism of Government policies and practices; and third, that failure to accord him a prerevocation hearing violated his Fifth Amendment right to procedural due process.

In light of the express language of the passport regulations, which permits their application only in cases involving likelihood of "serious damage" to national security or foreign policy, these claims are without merit.

Revocation of a passport undeniably curtails travel, but the freedom to travel abroad with a "letter of introduction" in the form of a passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation. The Court has made it plain that the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States. This was underscored in *Califano* v. *Aznavorian,* 439 U. S. 170, 176 (1978):

"Aznavorian urges that the freedom of international travel is basically equivalent to the constitutional right to interstate travel, recognized by this Court for over 100 years. *Edwards* v. *California,* 314 U. S. 160; *Twining* v. *New Jersey,* 211 U. S. 78, 97; *Williams* v. *Fears,* 179

---

[58] See *supra,* at 283–287, and nn. 1–8.

U. S. 270, 274; *Crandall* v. *Nevada,* 6 Wall. 35, 43–44; *Passenger Cases,* 7 How. 283, 492 (Taney, C. J., dissenting). But this Court has often pointed out the crucial difference between the freedom to travel internationally and the right of interstate travel.

" 'The constitutional right of interstate travel is virtually unqualified, *United States* v. *Guest,* 383 U. S. 745, 757–758 (1966); *Griffin* v. *Breckenridge,* 403 U. S. 88, 105–106 (1971). By contrast the "right" of international travel has been considered to be no more than an aspect of the "liberty" protected by the Due Process Clause of the Fifth Amendment. As such this "right," the Court has held, can be regulated within the bounds of due process.' (Citations omitted.) *Califano* v. *Torres,* 435 U. S. 1, 4 n. 6."

It is "obvious and unarguable" that no governmental interest is more compelling than the security of the Nation. *Aptheker* v. *Secretary of State,* 378 U. S., at 509; accord *Cole* v. *Young,* 351 U. S. 536, 546 (1956); see *Zemel, supra,* at 13–17. Protection of the foreign policy of the United States is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized.

Measures to protect the secrecy of our Government's foreign intelligence operations plainly serve these interests. Thus, in *Snepp* v. *United States,* 444 U. S. 507, 509, n. 3 (1980), we held that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." See also *id.,* at 511–513. The Court in *United States* v. *Curtiss-Wright Export Corp.* properly emphasized:

"[The President] has his confidential sources of information. He has his agents in the form of diplomatic,

consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results." 299 U. S., at 320.

Accord, *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.,* 333 U. S., at 111; The Federalist No. 64, pp. 392–393 (Mentor ed. 1961).

Not only has Agee jeopardized the security of the United States, but he has also endangered the interests of countries other than the United States [59]—thereby creating serious problems for American foreign relations and foreign policy. Restricting Agee's foreign travel, although perhaps not certain to prevent all of Agee's harmful activities, is the only avenue open to the Government to limit these activities.[60]

Assuming, *arguendo,* that First Amendment protections reach beyond our national boundaries, Agee's First Amendment claim has no foundation. The revocation of Agee's passport rests in part on the content of his speech: specifically, his repeated disclosures of intelligence operations and names of intelligence personnel. Long ago, however, this Court recognized that "[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 716 (1931), citing Z. Chafee, Freedom of Speech 10 (1920). Agee's disclosures, among other

---

[59] Agee's deportation from Great Britain was expressly grounded, *inter alia,* on Agee's "disseminating information harmful to the security of the United Kingdom," and his "aid[ing] and counsel[ing] others in obtaining for publication information which could be harmful to the security of the United Kingdom." P. Agee & L. Wolf, *supra* n. 1, at 289.

[60] Agee argues that the Government should be limited to an injunction ordering him to comply with his secrecy agreement. Tr. of Oral Arg. 36–39. This argument ignores the governmental interests at stake. As Agee concedes, such an injunction would not be enforceable outside of the United States. *Id.,* at 39.

things, have the declared purpose of obstructing intelligence operations and the recruiting of intelligence personnel. They are clearly not protected by the Constitution. The mere fact that Agee is also engaged in criticism of the Government does not render his conduct beyond the reach of the law.

To the extent the revocation of his passport operates to inhibit Agee, "it is an inhibition of *action*," rather than of speech. *Zemel*, 381 U. S., at 16–17 (emphasis supplied). Agee is as free to criticize the United States Government as he was when he held a passport—always subject, of course, to express limits on certain rights by virtue of his contract with the Government.[61] See *Snepp* v. *United States, supra.*

On this record, the Government is not required to hold a prerevocation hearing. In *Cole* v. *Young, supra*, we held that federal employees who hold "sensitive" positions "where they could bring about any discernible adverse effects on the Nation's security" may be suspended without a presuspension hearing. 351 U. S., at 546–547. For the same reasons, when there is a substantial likelihood of "serious damage" to national security or foreign policy as a result of a passport holder's activities in foreign countries, the Government may take action to ensure that the holder may not exploit the sponsorship of his travels by the United States. "[W]hile the Constitution protects against invasions of individual rights, it is not

---

[61] The District Court held that since Agee's conduct falls within the core of the regulation, Agee lacks standing to contend that the regulation is vague and overbroad. Tr. 11–12 (Jan. 3, 1980). We agree. See *Parker* v. *Levy*, 417 U. S. 733, 755–756 (1974).

In any event, there is no basis for a claim that the regulation is being used as a subterfuge to punish criticism of the Government. As evidenced in this case, the Government's interpretation of the terms "serious damage" and "national security" shows proper regard for constitutional rights and is precisely in accord with our holdings on the subject. *E. g., Cole* v. *Young*, 351 U. S. 536 (1956). Nor is there any basis for a claim of discriminatory enforcement. The Government is entitled to concentrate its scarce legal resources on cases involving the most serious damage to national security and foreign policy.

a suicide pact." *Kennedy* v. *Mendoza-Martinez,* 372 U. S. 144, 160 (1963). The Constitution's due process guarantees call for no more than what has been accorded here: a statement of reasons and an opportunity for a prompt postrevocation hearing.[62]

We reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

JUSTICE BLACKMUN, concurring.

There is some force, I feel, in JUSTICE BRENNAN's observations, *post,* at 312–318, that today's decision cannot be reconciled fully with all the reasoning of *Zemel* v. *Rusk,* 381 U. S. 1 (1965), and, particularly, of *Kent* v. *Dulles,* 357 U. S. 116 (1958), and that the Court is cutting back somewhat upon the opinions in those cases *sub silentio.* I would have preferred to have the Court disavow forthrightly the aspects of *Zemel* and *Kent* that may suggest that evidence of a longstanding Executive policy or construction in this area is not probative of the issue of congressional authorization. Nonetheless, believing this is what the Court in effect has done, I join its opinion.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today the Court purports to rely on prior decisions of this Court to support the revocation of a passport by the Secretary of State. Because I believe that such reliance is fundamentally misplaced, and that the Court instead has departed from the express holdings of those decisions, I dissent.

I

Respondent Philip Agee, a United States citizen residing in West Germany, is a former employee and current critic of

---

[62] We do not decide that these procedures are constitutionally required.

the Central Intelligence Agency (CIA). Respondent writes and speaks out extensively on United States clandestine intelligence operations, with the stated goal of disrupting the CIA. Part of his activity apparently involves the identification of United States undercover personnel situated throughout the world.

On December 23, 1979, the United States Consul General in Hamburg, West Germany, delivered a letter [1] to respondent notifying him that his passport had been revoked pursuant to 22 CFR § 51.70 (b)(4) (1980). That regulation, in combination with 22 CFR § 51.71 (a) (1980), permits revocation of a passport when "[t]he Secretary determines that the national's activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States." [2]

Agee declined to follow administrative procedures available to attack the revocation and instead brought this action in the District Court for the District of Columbia for declara-

---

[1] The letter stated in pertinent part:

"The Department's action is predicated upon a determination made by the Secretary under the provisions of Section 51.70 (b)(4) that your activities abroad are causing or are likely to cause serious damage to the national security or the foreign policy of the United States. The reasons for the Secretary's determination are, in summary, as follows: Since the early 1970's, it has been your stated intention to conduct a continuous campaign to disrupt the intelligence operations of the United States. In carrying out that campaign, you have travelled in various countries (including, among others, Mexico, the United Kingdom, Denmark, Jamaica, Cuba and Germany), and your activities in those countries have caused serious damage to the national security and the foreign policy of the United States. Your stated intention to continue such activities threatens additional damage of the same kind." Quoted in *Agee* v. *Muskie,* 203 U. S. App. D. C. 46, 48, 629 F. 2d 80, 82 (1980).

[2] Title 22 CFR § 51.71 (a) (1980) allows revocation, restriction, or limitation of a passport where the national would not be entitled to issuance of a new passport pursuant to 22 CFR § 51.70 (1980). For purposes of this case, denial and revocation of a passport are treated identically.

tory and injunctive relief against the Secretary of State. For purposes of cross-motions for summary judgment on the facial validity of the regulations, respondent conceded that he was causing or was likely to cause serious damage to national security or foreign policy, and, therefore, fell within the coverage of the regulations. *Agee* v. *Muskie,* 203 U. S. App. D. C. 46, 48, 629 F. 2d 80, 82 (1980); App. 11. He argued, *inter alia,* that Congress had not given the Secretary of State authority to promulgate the regulations under which his passport was revoked. Both the District Court, *Agee* v. *Vance,* 483 F. Supp. 729 (1980), and the Court of Appeals for the District of Columbia Circuit accepted this argument and granted respondent the relief requested.

## II

This is not a complicated case. The Court has twice articulated the proper mode of analysis for determining whether Congress has delegated to the Executive Branch the authority to deny a passport under the Passport Act of 1926. *Zemel* v. *Rusk,* 381 U. S. 1 (1965); *Kent* v. *Dulles,* 357 U. S. 116 (1958). The analysis is hardly confusing, and I expect that had the Court faithfully applied it, today's judgment would affirm the decision below.

In *Kent* v. *Dulles, supra,* the Court reviewed a challenge to a regulation of the Secretary denying passports to applicants because of their alleged Communist beliefs and associations and their refusals to file affidavits concerning present or past membership in the Communist Party. Observing that the right to travel into and out of this country is an important personal right included within the "liberty" guaranteed by the Fifth Amendment, *id.,* at 125–127, the Court stated that any infringement of that liberty can only "be pursuant to the law-making functions of the Congress," and that delegations to the Executive Branch that curtail that liberty must be construed narrowly, *id.,* at 129. Because the Passport Act of 1926—the same statute at issue here—did not expressly

authorize the denial of passports to alleged Communists, the Court examined cases of actual passport refusals by the Secretary to determine whether "it could be fairly argued" that this category of passport refusals was "adopted by Congress in light of prior administrative practice." *Id.,* at 128. The Court was unable to find such prior administrative practice, and therefore held that the regulation was unauthorized.

In *Zemel* v. *Rusk, supra,* the issue was whether the Secretary could restrict travel for all citizens to Cuba. In holding that he could, the Court expressly approved the holding in *Kent:*

> "We have held, *Kent* v. *Dulles, supra,* and reaffirm today, that the 1926 Act must take its content from history: it authorizes only those passport refusals and restrictions 'which it could fairly be argued were adopted by Congress in light of prior administrative practice.' *Kent* v. *Dulles, supra,* at 128. So limited, the Act does not constitute an invalid delegation." 381 U. S., at 17–18.

In reaching its decision, the Court in *Zemel* relied upon numerous occasions when the State Department had restricted travel to certain international areas: Belgium in 1915; Ethiopia in 1935; Spain in 1936; China in 1937; Yugoslavia in the late 1940's; Hungary in 1949; Czechoslovakia in 1951; Albania, Bulgaria, Communist China, Czechoslovakia, Hungary, Poland, Rumania, and the Soviet Union in 1952; Albania, Bulgaria, and portions of China, Korea, and Vietnam in 1955; and Egypt, Israel, Jordan, and Syria in 1956.

As in *Kent* and *Zemel,* there is no dispute here that the Passport Act of 1926 does not *expressly* authorize the Secretary to revoke Agee's passport. *Ante,* at 290.[3] Therefore, the

---

[3] The Passport Act of 1926, 22 U. S. C. § 211a (1976 ed., Supp. IV), states in pertinent part:

"The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic

sole remaining inquiry is whether there exists "with regard to the sort of passport [revocation] involved [here], an administrative *practice* sufficiently substantial and consistent to warrant the conclusion that Congress had implicitly approved it." *Zemel* v. *Rusk, supra,* at 12 (emphasis added). The Court today, citing to this same page in *Zemel,* applies a test markedly different from that of *Zemel* and *Kent* and in fact expressly disavowed by the latter. The Court states: "We hold that the *policy* announced in the challenged regulations is 'sufficiently substantial and consistent' to compel the conclusion that Congress has approved it. See *Zemel,* 381 U. S., at 12." *Ante,* at 306 (emphasis added). The Court also observes that "a consistent administrative *construction* of [the Passport Act] must be followed by the courts ' "unless there are compelling indications that it is wrong." ' " *Ante,* at 291 (emphasis added).

But clearly neither *Zemel* nor *Kent* holds that a long-standing Executive *policy* or *construction* is sufficient proof that Congress has implicitly authorized the Secretary's action. The cases hold that an administrative *practice* must be demonstrated; in fact *Kent* unequivocally states that mere *construction* by the Executive—no matter how longstanding and consistent—is *not* sufficient.[4] The passage in *Kent* is worthy of full quotation:

> "Under the 1926 Act and its predecessor a large body of precedents grew up which repeat over and again that the issuance of passports is 'a discretionary act' on the part of the Secretary of State. The scholars, the courts,

---

representatives of the United States . . . under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

[4] The lower courts have had no trouble understanding and following the holdings of *Kent* and *Zemel.* See, *e. g., Lynd* v. *Rusk,* 128 U. S. App. D. C. 399, 404–405, 389 F. 2d 940, 945–946 (1967); *Woodward* v. *Rogers,* 344 F. Supp. 974, 985 (DC 1972), summarily aff'd, 159 U. S. App. D. C. 57, 486 F. 2d 1317 (1973).

the Chief Executive, and the Attorneys General, all so said. This long-continued *executive construction* should be enough, it is said, to warrant the inference that Congress adopted it. See *Allen* v. *Grand Central Aircraft Co.*, 347 U. S. 535, 544–545; *United States* v. *Allen-Bradley Co.*, 352 U. S. 306, 310. But the key to that problem, as we shall see, is in the manner in which the Secretary's discretion was *exercised,* not in the *bare fact that he had discretion."* 357 U. S., at 124–125 (footnotes omitted) (emphasis added).

The Court's requirement in *Kent* of evidence of the Executive's *exercise* of discretion as opposed to its possession of discretion may best be understood as a preference for the strongest proof that Congress knew of and acquiesced in that authority. The presence of sensitive constitutional questions in the passport revocation context cautions against applying the normal rule that administrative constructions in cases of statutory construction are to be given great weight. Cf. *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965). Only when Congress had maintained its silence in the face of a consistent and substantial pattern of actual passport denials or revocations—where the parties will presumably object loudly, perhaps through legal action, to the Secretary's exercise of discretion—can this Court be sure that Congress is aware of the Secretary's actions and has implicitly approved that exercise of discretion. Moreover, broad statements by the Executive Branch relating to its discretion in the passport area lack the precision of definition that would follow from concrete applications of that discretion in specific cases.[5] Although Con-

---

[5] For instance, the petitioner cites a rule promulgated by the Executive Branch in 1903 providing that "[t]he Secretary of State has the right in his discretion to refuse to issue a passport, and will exercise this right towards anyone who, he has reason to believe, desires a passport to further an unlawful or improper purpose." 3 J. Moore, A Digest of International Law 902 (1906); Brief for Petitioner 28. This statement can hardly

gress might register general approval of the Executive's over-all policy, it still might disapprove of the Executive's pattern of applying that broad rule in specific categories of cases.

Not only does the Court ignore the *Kent-Zemel* requirement that Executive discretion be supported by a consistent administrative practice, but it also relies on the very Executive construction and policy deemed irrelevant in *Kent*. Thus, noting that "[t]he President and the Secretary of State consistently construed the 1856 [Passport] Act to preserve their authority to withhold passports on national security and foreign policy grounds," *ante,* at 295, the Court reaches out to hold that "Congress, in 1926, adopted the longstanding administrative construction of the 1856 statute," *ante,* at 297–298. The Court quotes from 1869 and 1901 opinions of the Attorneys General. But *Kent* expressly cited both of these opinions as examples of Executive constructions *not* relevant to the determination whether Congress had implicitly approved the Secretary's exercise of authority. Compare *ante,* at 295–296, with *Kent* v. *Dulles,* 357 U. S., at 125, n. 11. The Court similarly relies on four Executive Orders issued between 1907 and 1917 to buttress its position, even though *Kent* expressly cited the same four Orders as examples of Executive constructions inapposite to the proper inquiry. Compare *ante,* at 296, n. 31, with *Kent* v. *Dulles, supra,* at 124, n. 10.[6] Where the Court in *Kent* discounted the constructions of the Act made by "[t]he scholars, the courts, the Chief Executive, and the Attorneys General," today's Court decides this case on the basis of constructions evident from "an unbroken line of

___

be thought to communicate to Congress the contours of the Executive's discretion; indeed it is little more than embellishment on the passport legislation itself.

[6] In contrast with the *Kent* Court, today's Court relies on Executive Orders promulgated after passage of the Passport Act of 1926. Compare *ante,* at 298, n. 39, with *Kent* v. *Dulles,* 357 U. S., at 124, n. 10.

Executive Orders, regulations, instructions to consular officials, and notices to passport holders." Compare *ante,* at 298, with *Kent* v. *Dulles, supra,* at 124 (footnotes omitted).[7]

The Court's reliance on material expressly abjured in *Kent* becomes understandable only when one appreciates the paucity of recorded administrative practice—the only evidence upon which *Kent* and *Zemel* permit reliance—with respect to passport denials or revocations based on foreign policy or national security considerations relating to an individual. The Court itself identifies only three occasions over the past 33 years when the Secretary has revoked passports for such reasons. *Ante,* at 302.[8] And only one of these cases involved

---

[7] Even if the Court were correct to use administrative constructions of passport legislation, it is by no means certain that the Executive *did* construe the Acts to give it the discretion alleged here, since it sometimes referred to the unqualified rights of citizens to passports. See, *e. g.,* 15 Op. Atty. Gen. 114, 117 (1876); 13 Op. Atty. Gen. 397, 398 (1871). Indeed the State Department has sought legislation from Congress to provide the sort of authority exercised in this case. See S. 4110, § 103 (6), 85th Cong., 2d Sess. (1958); Hearings on S. 2770, S. 3998, S. 4110, and S. 4137 before the Senate Committee on Foreign Relations, 85th Cong., 2d Sess., 1, 4 (1958); see also H. R. 14895, § 205 (e), 89th Cong., 2d Sess. (1966). This hardly suggests that the Executive thought it had such authority.

[8] The Court of Appeals below identified a total of six denials or revocations that were arguably for foreign policy or national security reasons. 203 U. S. App. D. C., at 51, 629 F. 2d, at 86. Two of the six occurred prior to passage of the Passport Act of 1926, three during the 1950's, and one over the past 12 years. Judge MacKinnon's dissenting opinion below and the petitioner's brief identify only a few more cases. However, as the petitioner readily admits:

"Because passport files are maintained by name rather than by category of applicant or reason for disposition, it is virtually impossible to compile comprehensive statistical data regarding passport denials on national security or foreign policy grounds." Brief for Petitioner 29, n. 22.

One wonders, then, how the petitioner can argue that *Congress* was aware of any administrative practice, when the data is unavailable even to the

a revocation pursuant to the regulations challenged in this case. Yet, in 1979 alone, there were 7,835,000 Americans traveling abroad. U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 253 (101st ed., 1980).

In light of this record, the Court, somewhat defensively, comments: "The Secretary has construed and applied his regulations consistently, and it would be anomalous to fault the Government because there were so few occasions to exercise the announced policy and practice. . . . It would turn *Kent* on its head to say that simply because we have had only a few situations involving conduct such as that in this record, the Executive lacks the authority to deal with the problem when it is encountered." *Ante,* at 303. Of course, no one is "faulting" the Government because there are only few occasions when it has seen fit to deny or revoke passports for foreign policy or national security reasons. The point that *Kent* and *Zemel* make, and that today's opinion should make, is that the Executive's authority to revoke passports touches an area fraught with important constitutional rights, and that the Court should therefore "construe narrowly all delegated powers that curtail or dilute them." *Kent* v. *Dulles, supra,* at 129. The presumption is that Congress must expressly delegate authority to the Secretary to deny or revoke passports for foreign policy or national security reasons before he may exercise such authority. To overcome the presumption against an implied delegation, the Government must show "an administrative practice sufficiently substantial and consistent." *Zemel* v. *Rusk,* 381 U. S., at 12. Only in this way can the Court satisfy itself that Congress has implicitly approved such exercise of authority by the Secretary.

---

Executive. In any event, the slim practice that Judge MacKinnon and the petitioner cite could hardly be termed a sufficiently consistent and substantial administrative practice to pass the *Kent-Zemel* test.

## III

I suspect that this case is a prime example of the adage that "bad facts make bad law." Philip Agee is hardly a model representative of our Nation. And the Executive Branch has attempted to use one of the only means at its disposal, revocation of a passport, to stop respondent's damaging statements. But just as the Constitution protects both popular and unpopular speech, it likewise protects both popular and unpopular travelers. And it is important to remember that this decision applies not only to Philip Agee, whose activities could be perceived as harming the national security, but also to other citizens who may merely disagree with Government foreign policy and express their views.[9]

The Constitution allocates the lawmaking function to Congress, and I fear that today's decision has handed over too much of that function to the Executive. In permitting the Secretary to stop this unpopular traveler and critic of the CIA, the Court professes to rely on, but in fact departs from, the two precedents in the passport regulation area, *Zemel* and *Kent*. Of course it is always easier to fit oneself within the safe haven of *stare decisis* than boldly to overrule precedents

---

[9] An excerpt from the petitioner's portion of the oral argument is particularly revealing:

"QUESTION: General McCree, supposing a person right now were to apply for a passport to go to Salvador, and when asked the purpose of his journey, to say, to denounce the United States policy in Salvador in supporting the junta. And the Secretary of State says, I just will not issue a passport for that purpose. Do you think that he can consistently do that in the light of our previous cases?

"MR. McCREE: I would say, yes, he can. Because we have to vest these—The President of the United States and the Secretary of State working under him are charged with conducting the foreign policy of the Nation, and the freedom of speech that we enjoy domestically may be different from that that we can exercise in this context." Tr. of Oral Arg. 20.

The reach of the Secretary's discretion is potentially staggering.

320

of several decades' standing. Because I find myself unable to reconcile those cases with the decision in this case, however, and because I disagree with the Court's *sub silentio* overruling of those cases, I dissent.[10]

---

[10] Because I conclude that the regulation is invalid as an unlawful exercise of authority by the Secretary under the Passport Act of 1926, I need not decide the important constitutional issues presented in this case. However, several parts of the Court's whirlwind treatment of Agee's constitutional claims merit comment, either because they are extreme oversimplifications of constitutional doctrine or mistaken views of the law and facts of this case.

First, the Court states:

"To the extent the revocation of his passport operates to inhibit Agee, 'it is an inhibition of *action*,' rather than of speech. . . . Agee is as free to criticize the United States Government as he was when he held a passport—always subject, of course, to express limits on certain rights by virtue of his contract with the Government." *Ante*, at 309 (footnote omitted).

Under the Court's rationale, I would suppose that a 40-year prison sentence imposed upon a person who criticized the Government's food stamp policy would represent only an "inhibition of action." After all, the individual would remain free to criticize the United States Government, albeit from a jail cell.

Respondent argues that the revocation of his passport "was intended to harass, penalize, and deter his criticism of United States policies and practices, in violation of the First Amendment." Brief for Respondent 112. The Court answers:

"Agee's disclosures, among other things, have the declared purpose of obstructing intelligence operations and the recruiting of intelligence personnel. They are clearly not protected by the Constitution." *Ante*, at 308–309.

The Court seems to misunderstand the prior precedents of this Court, for Agee's speech is undoubtedly protected by the Constitution. However, it may be that respondent's First Amendment right to speak is outweighed by the Government's interest in national security. The point respondent makes, and one that is worthy of plenary consideration, is that revocation of his passport obviously does implicate First Amendment rights by chilling his right to speak, and therefore the Court's responsibility must be to balance that infringement against the asserted governmental interests to determine whether the revocation contravenes the First

Amendment. I add that *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931), is hardly a relevant or convincing precedent to sustain the Secretary's action here. Only when there is proof that the activity "must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea" does the *Near* exception apply. *New York Times Co.* v. *United States*, 403 U. S. 713, 726–727 (1971) (BRENNAN, J., concurring). Agee's concession in the trial court below was only for the purpose of challenging the facial validity of the regulation, not its application to his case. Therefore, until the facts are known, the majority no less than I can have no idea whether Agee's conduct actually would fall within the extreme factual category presented by *Near*.

Second, the Court purports to agree with the District Court's holding that Agee lacks standing to contend that the regulation is vague and overbroad because his conduct falls within the core of the regulation. *Ante,* at 309, n. 61. I find this an untenable conclusion on the record before us and the precedents of this Court. The District Court nowhere held that respondent lacked standing to contend vagueness and overbreadth. At most, on the pages cited by the Court, Judge Gesell stated: "Your client, you would be conceding, falls within the core of the objective of the regulation and the fact that it may be over-broad as to somebody else isn't very persuasive to me." Tr. 11 (Jan. 3, 1980). Not only is this obviously not a holding, and not only did Judge Gesell never mention vagueness, but further portions of the transcript clearly establish that Judge Gesell expressly declined to reach Agee's overbreadth claim for purposes of this summary judgment motion, and that this claim was reserved for future consideration. *Id.*, at 16. In any event, it is strange indeed to suggest that an individual whose activities admittedly fall within the core of the challenged regulation does not have standing to argue overbreadth. After all, the purpose of the overbreadth doctrine in First Amendment cases is precisely to permit a person who falls within the legislation nevertheless to challenge the wide sweep of the legislation as it affects another's protected activity. See, *e. g., Gooding* v. *Wilson*, 405 U. S. 518, 520–521 (1972). And nothing in *Parker* v. *Levy*, 417 U. S. 733 (1974), the case cited by the Court, detracts from that doctrine.

Because the Court concludes that Agee has no standing to raise vagueness and overbreadth claims, it does not decide the question whether the challenged regulation is constitutionally infirm under those doctrines. I can only say that, for me, these are substantial issues highlighted particularly by the Solicitor General's comments at oral argument as to the reach of the regulations. See n. 9, *supra*.