KUEHNE & NAGEL, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 84–7–00945

■■■■■

(Decided December 22, 1986)

*Busby, Rehm and Leonard (John B. Rehm, Jonathan Hemenway Glazier,* and *Munford Page Hall, II)* for plaintiff.

*Judge Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Civil Division, Department of Justice *(John J. Mahon)* for defendant.

OPINION

RESTANI, *Judge:* Plaintiff challenges Customs' classification of certain entries made in 1984 of tobacco, in a form smaller than half leaves, as stemmed filler tobacco under item 170.35 of the Tariff Schedules of the United States (TSUS). Plaintiff claims the appropriate TSUS item is 170.60, scrap tobacco. Alternatively, plaintiff claims classification under item 170.80, tobacco, not specifically provided for.

As always, the starting point as the court's analysis is the statute. At first glance, the merchandise would seem to be stemmed filler tobacco, and item 170.35 would seem to be applicable. The tobacco reached its condition, that is, less than half-leaf, yet suitable for cigarette manufacture, in a purposeful way. Therefore, item 170.60, scrap tobacco, would not seem applicable.

---

[8] The Court stresses that it expresses no opinion either as to the outcome of the grand jury investigation or as to the merits of plaintiff's claim in the instant litigation.

At trial, however, plaintiff's witnesses explained that historically anything smaller than a half leaf of tobacco was considered to be scrap by the Customs Service. This designation was used originally when tobacco leaves, particularly those intended for cigar filler, were hand stemmed so that half leaves resulted. Such larger pieces were particularly useful in producing "long filler" for cigars and were also considered desirable by cigarette manufacturers. Accidentally broken leaves were considered to be scrap. In addition, a practice developed whereby *purposely* produced pieces, smaller than a half-leaf, also were considered to be scrap by Customs. At one point in time this practice probably applied to inexpensive cigar and chewing tobacco. *See Summaries of Tariff Information* 1020 (1929); 6 *Summaries of Tariff Information* 13 (1948). Eventually, Customs applied the practice to tobacco which was acceptable for cigarette manufacture.[1]

This does not seem consistent with any of the many common meanings of the word "scrap." The court also notes that *Webster's Third New International Dictionary* (1967) contains a definition of "scrap" which reads as follows: "a by-product of the handling of tobacco consisting of loose tangled pieces of leaves, floor sweepings, but no stems."[2] The merchandise at issue is not a "by-product" of tobacco handling. Plaintiff argues that commercial meaning rather than common meaning controls, because Congress specifically adopted Customs practice, which plaintiff contends reflects commercial meaning.[3]

The court necessarily must be concerned about the meaning of words at the time the TSUS was enacted in the nineteen sixties, whether or not that meaning has changed. *Davies Turner & Co. v. United States*, 45 CCPA 39, C.A.D. 669 (1957). Therefore, to determine relevant commercial meaning, the court will not focus on trade definitions from the eighties, which reflect both Customs' current views and the domestic industry's hoped-for categorization.

The parties agree that the domestic industry, which presumably knows commercial meaning, has input into the formulation of the standards for government grading of tobacco. In their pre-trial papers the parties also agreed as follows:

> During the period July of 1952 through April of 1963, the Official Standard Grades for Flue-Cured Tobacco of the Agricultural Marketing Service of the Department of Agriculture defined "web scrap" as follows: "Stemmed scrap or seamless scrap which is a by-product from stemming tobacco or handling strips, consisting chiefly of portions of strips; or a lot of tobacco from which the stems have been removed by thrashing or other means which break the web or sides of leaves into small pieces."

---

[1] Two former Customs employees testified on this point. Neither appeared to have great familiarity with cigarette manufacture, but they testified clearly about the existence of Customs' practice, if not the length of its duration.

[2] The definition is also found in *Webster's Second New International Dictionary* (1954).

[3] The practice was discontinued and there is no challenge to the procedures used in ending the practice.

That document defined "scrap" as follows: "A by-product from handling tobacco in both the unstemmed and stemmed forms, consisting chiefly of loose, untied, and unstemmed leaves or the web portions of leaves, which accumulate in warehouses, packing and conditioning plants, and stemmeries; or tobacco which has been reduced to scrap by any process."

The second part of the definition of "scrap" seems circular but the definition of "web scrap" (although one could debate what the word "small" means) tends to support plaintiff's view of relevant commercial meaning.

Defendant relies on the definitions of "scrap" and "scrap filler" found in the *Tobacco Dictionary* (R. Jahn 1954) at 144–145:

**Scrap**

By government definition, a by-product from handling leaves in both the unstemmed and stemmed forms: that is, the leaves, floor sweepings, and all other tobacco materials except stems which accumulate in the manufacturing process.

In the cigar industry scrap is classified as Number One, Number Two, Siftings and Dust. Number One Scrap may be used for short filler, and number two for very inexpensive scrap-filled cigars. Either may be used for blending in smoking or chewing tobaccos. Siftings and Dust are used for fertilizer.

**Scrap Filler**

Any filler made of scrap tobaccos. Most modern scrap filled cigars are of small sizes. The term has come to indicate especially the poorer grades of scrap filler as distinguished from Short Filler.

These definitions do support defendant's view. Furthermore, defendant called two industry witnesses (and one government witness) who testified that in the fifties and sixties the commercial meaning of scrap did not include intentionally cut-up tobacco for cigarette manufacture. Although the possible motives of the witnesses cause the court to weigh their testimony carefully, (all were or are associated with domestic interests), the court is not convinced that the testimony conflicted with any of the essential definitions provided, including those provided by plaintiff.[4] The definition of "web scrap" cited by plaintiff is not entirely clear and it may reflect Customs former practice, more than general commercial meaning. Weighing all of the testimony, it seems persuasive on the crucial points asserted by defendant. The court recognizes the difficulty plaintiff might have in locating industry witnesses in its favor, but the court cannot consider testimony it did not hear.

Plaintiff, nonetheless, asks that the court disregard what the court finds to be both common and commercial meaning, because Congress had another meaning in mind. Plaintiff directs the court's

[4] The defense witnesses' definition of "strip" did disagree with the pre-1963 Department of Agriculture definition. "Strip," however, is not a word used in the TSUS and its meaning is not determinative on the issue of whether tobacco is "scrap."

attention to 3 *Tariff Classification Study* 205 (1960) which reads in part:

> Part 13 of schedule 1 brings together existing tariff provisions applicable to tobacco and tobacco products. The revised schedule clarifies existing tariff language and administrative practice and involves no rate changes.

Apparently, such notes, which are legislative history, have been used to impute to the Congress knowledge of established administrative practice, even if not specifically described in the written legislative history. *See Maiden Lane Trading Corp.* v. *United States,* 68 Cust. Ct. 183, 343 F. Supp. 1366 (1972). The court in *Maiden Lane,* however, viewed such a note as a reference to broad valuation principles and then used the note only to reinforce its conclusion. Here, plaintiff requests the court to use such a note to impute to Congress knowledge of a very specific practice, and a practice which also appears absurd when viewed in the context of common and commercial meaning as well as modern processing.[5] This is a large leap from *Maiden Lane.*[6]

On the other hand, it cannot be disputed reasonably that if a longstanding administrative practice with regard to a law is known to Congress and it reenacts the law without change, the practice is weighty evidence of Congressional intent. *Haig* v. *Agee,* 453 U.S. 280, 301 (1981). Here we have Congress' own statement at the time of enactment of the TSUS that it meant to adopt Customs' administrative practices. What is unknown is how long before 1963 the practice of classifying machine threshold *cigarette* tobacco as "scrap" existed.[7] Because it is not clear that the practice was longstanding or that it was of widespread public knowledge, the court cannot conclude that Congress in 1963 must be considered to have known it.[8]

Plaintiff claims, however, that it can bridge the knowledge gap because of the testimony of the very person who drafted the *Tariff Classification Study.* Such a witness was permitted to testify, subject to the court's ruling on a motion to strike, and he indeed stated that he knew of the practice and meant the term "scrap" to cover purposely cut-up stemmed filler tobacco, such as that at issue. Although, a letter to a committee chair, received prior to enactment, may have relevance in discerning whether Congress was notified of a practice and thus sin discerning legislative intent, *see Rohm and Haas Co.* v. *United States,* 5 CIT 218, 225–26, 568 F. Supp. 751, 757

---

[5] Stemming and threshing are now one process. Stemmed half leaves for cigarette filler are not the norm. This appears to be true for imported as well as domestic cigarette tobacco, according to the government witness who is responsible for grading imported tobacco currently.

[6] Although the Summaries of Trade and Tariff Information (1967) do support plaintiff's view, the summaries should not be used as a primary source of legislative intent; they simply reflect Customs' practices. *Hawaiian Motor Co.* v. *United States,* 67 CCPA 42, 45–46, 617 F.2d 286, 289 (1980).

[7] Although the TSUS makes no distinction between cigar and cigarette tobaccos, different uses, nonetheless, may impact on classification.

[8] It has been stated that where a statute is ambiguous but has been reenacted without change, longstanding administrative practice will be presumed correct. *Commonwealth Oil Refining Co.* v. *United States,* 60 CCPA 162, 174, C.A.D. 1105 (1973) citing *C.J. Tower & Sons* v. *United States,* 44 CCPA 41, 44, C.A.D. 634 (1957) and *United States* v. *Edward I. Petow & Son,* 34 CCPA 55, 64 C.A.D. 343 (1946). Not only is the acceptance of the practice not without exception, but if taken at face value, the statute involved here is not ambiguous.

(1983), *aff'd* 727 F.2d 1095 (Fed. Cir. 1984), the court finds oral testimony of what someone said to a drafter and what he recollects of it approximately three decades later only minimally probative. It is certainly not enough to convince the court that the common and commercial meaning should be abandoned.[9]

For argument's sake, let us look at what the witness said. He said that he knew about the practice of allowing intentionally cut-up stemmed filler tobacco to be called "scrap," and he meant such tobacco to be included in the TSUS item for "scrap." He did not relate this practice to cigarette manufacture nor did he say that he meant to abandon all ordinary connotations of the word "scrap." If three decades ago, the witness accepted any ordinary meaning of the word "scrap," it is likely that of something less desirable than the norm. Today, cut-up stemmed cigarette filler tobacco is the norm. The testimony indicates that, most likely, it was not so in the late fifties, the likely time of the recounted discussions. At that time the flue-cured industry was switching to machine stemming and threshing. The Burley industry[10] did not arrive at that point until 1973. The tariff schedules are often said to be for the future as well as the present. *Davies, supra.*[11] As long as it is consistent with the intent of the enacting Congress, the words of the TSUS can be adapted to modern technology. *Id.*

The court finds that in any sense of the word, from 1960 to present, the product at issue has not been scrap and that Congress in 1963 would not have intended the 1984 product at issue to be classified as "scrap."

Finally, plaintiff argues that cut-up tobacco is simply not leaf tobacco and cannot be classified under item 170.35, which covers leaf tobacco only.[12] "Leaf tobacco" is defined in 7 C.F.R. § 30.2 (1985) as:

> Tobacco in the forms in which it appears between the time it is cured and stripped from the stalk, or primed and cured, and the time it enters into the different manufacturing processes. The acts of stemming, sweating or fermenting, and conditioning are not regarded as manufacturing processes. Leaf tobacco does not include any manufactured or semimanufactured tobacco, stems which have been removed from leaves, cuttings, clippings, trimmings, shorts, or dust.

Apparently this definition has been in use by the Department of Agriculture since at least 1929. Its implication is that all unmanufactured tobacco is "leaf tobacco," except stems and "by-product." As indicated previously, the tobacco at issue is not a by-product. It is

---

[9] In any case, the court believes that much of this witness' testimony should not be admitted into evidence. The court should not be in the position of calling upon legislators and their staff to explain meaning. Courts interpret statutes by looking at the statute, and the information that was available to all members of Congress when Congress considered the legislation at issue. The secret knowledge or thoughts of drafters are irrelevant. The court finds Customs' former practice erroneous and it will not impute knowledge of it to Congress in 1963, without some specific written legislative history on point.

[10] Burley and flue-cured are types of domestic cigarette filler tobacco. There was little testimony about Maryland tobacco, the other domestic type.

[11] Although this maxim usually is applied to articles not in existence at the time of enactment of the relevant tariff law, it seems appropriate to apply it to a fluid concept such as "scrap," in the context of developing technology.

[12] There are other categories of leaf tobacco, such as "wrapper" tobacco, but they are inapplicable.

also not "stems." Thus, the question remaining is whether this product is "manufactured." If it is "manufactured" it belongs in item 170.80, not in item 170.35. The parties are in agreement that this question was not addressed in any detail in the previous proceedings. Taking into consideration the recommendations of counsel, the court will accept further testimony and briefing on this issue, in lieu of remand.