# Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports

Section 129(e) of Pub. L. No. 102-138 and section 503 of Pub. L. No. 102-140 are unconstitutional to the extent that they purport to limit the President's ability to issue more than one official or diplomatic passport to United States government personnel.

The single-passport requirements set forth in section 129(e) and section 503 are severable from the remainder of the statutes in which they appear.

The President is constitutionally authorized to decline to enforce the portions of section 129(e) and section 503 that purport to limit the issuance of official and diplomatic passports.

January 17, 1992

## MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum responds to your request for our opinion on several issues raised by the nearly identical provisions of section 129(e) of the Foreign Relations Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102-138, 105 Stat. 647, 662 (1991), and section 503 of Departments of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriations Act, 1992, Pub. L. No. 102-140, 105 Stat. 782, 820 (1991), an act making appropriations for the State Department and other agencies. Specifically, you asked whether these provisions are unconstitutional to the extent that they purport to prohibit the issuance of more than one official or diplomatic passport to United States government officials, whether they are severable from the remainder of the two bills, and whether the President may decline to enforce them.[1] For the reasons explained below, we conclude that the relevant portions of section 129(e) and section 503 are unconstitutional to the extent that they limit the issuance of official and diplomatic passports and that those sections are severable from the remainder of the two statutes. Under the circumstances, we further conclude that the President is constitutionally authorized to decline to enforce these provisions.

---

[1] Memorandum for Timothy E. Flanigan, Acting Assistant Attorney General, Office of Legal Counsel, from C. Boyden Gray, Counsel to the President (Oct. 23, 1991) ("Opinion Request").

# I.

Section 129 of Pub. L. No. 102-138 provides in part:

> (e)(1) REQUIREMENT OF SINGLE PASSPORT. — The Secretary of State shall not issue more than one official or diplomatic passport to any official of the United States Government for the purpose of enabling that official to acquiesce in or comply with the policy of the majority of [the] Arab League nations of rejecting passports of, or denying entrance visas to, persons whose passport or other documents reflects that the person has visited Israel.
>
> (2) IMPLEMENTATION OF POLICY OF NONCOMPLI-ANCE.— The Secretary of State shall promulgate such rules and regulations as are necessary to ensure that officials of the United States Government do not comply with, or acquiesce in, the policy of the majority of Arab League nations of rejecting passports of, or denying entrance visas to, persons whose passport or other documents reflect that the person has visited Israel.[2]

The relevant portion of section 503 of Pub. L. No. 102-140 is nearly identical:

> [Ninety] days after the enactment of this Act, none of the funds provided in this Act shall be used by the Department of State to issue more than one official or diplomatic passport to any United States Government employee for the purpose of enabling that employee to acquiesce in or comply with the policy of the majority of Arab league nations of rejecting passports of, or denying entrance visas to, persons whose passports or other documents reflect that that person has visited Israel.[3]

---

[2] 105 Stat. at 662. By virtue of section 129(e)(3)(A), section 129(e) is effective January 26, 1992.

Because you have requested our opinion only as to those provisions that "purport to forbid the issuance of more than one official or diplomatic passport to U.S. officials for the purpose of enabling those officials to acquiesce in" the Arab League policy described in section 129, we have so limited our review and will for ease of reference refer to the operative portion of section 129, section 129(e). *See* Opinion Request.

We note, however, that section 129 also prohibits issuance of "any passport that is designated for travel only to Israel." Pub. L. No. 102-138, § 129(d)(1), 105 Stat. at 661. To the extent that this prohibition applies to official and diplomatic passports, it suffers from the same constitutional defects as the prohibition on multiple passports.

[3] 105 Stat. at 820. Like section 129 of Pub. L. No. 102-138, section 503 also prohibits the issuance of Israel-only passports: "None of the funds provided in this Act shall be used by the Department of State to issue any passport that is designated for travel only to Israel . . . ." *Id.* Our discussion of section 503 is limited to the provision that forbids the issuance of more than one official or diplomatic passport to United States government officials. *See supra* note 2. References to section 503 in this memorandum should be understood to be so limited.

These provisions purport to effect a change in the State Department's current practice in issuing official and diplomatic passports to government personnel sent to the Middle East, which is described in the conference report on Pub. L. No. 102-138: "Officials of the U.S. Government traveling in the Middle East are, as a general practice, issued two passports so that they can travel to Israel and to Arab countries in compliance with the passport and visa policy of the majority of Arab League nations." H.R. Conf. Rep. No. 238, 102d Cong., 1st Sess. 107 (1991). You have asked our opinion whether legislation banning continuation of this practice is unconstitutional.

The State Department has concluded that section 129(e) and section 503 would unconstitutionally intrude on the President's authority to conduct diplomacy on behalf of the United States.[4] In the State Department's view, these provisions would "directly interfere with the President's ability to send his diplomats abroad to negotiate with foreign governments," *id.* at 7, and "interfere with the discretion and flexibility needed by the President to carry out the exclusively executive function of foreign diplomacy," *id.* at 12.[5] Accordingly, the State Department concludes that these provisions are unconstitutional. *Id.* at 14.

As part of its analysis, the State Department "examined a variety of possibilities for carrying out diplomatic functions without the issuance of more than one official or diplomatic passport," but it was "unable to identify a satisfactory alternative in a significant number of cases that would be affected by this legislation." *Id.* at 5. These alternatives included: (1) "travelling to either Israel or Arab League nations without presenting a passport;" (2) "ask[ing] Israel not to stamp the passports of U.S. officials;" (3) "seek[ing] advance permission from the receiving Arab country every time a U.S. official would be entering that country with a passport reflecting travel to Israel;" (4) "cancelling a diplomatic or official passport that reflected travel to Israel whenever the holder needed to travel to an Arab League nation, and reissuing a new passport;" and (5) "arranging negotiations so that travel to Israel followed travel to the Arab countries." *Id.* at 5-6. The State Department rejected all of these alternatives.[6] After reviewing these options, it concluded:

---

[4] Memorandum for Timothy E. Flanigan, Acting Assistant Attorney General, Office of Legal Counsel, from Jamison M. Selby, Deputy Legal Adviser, Department of State (Jan. 3, 1992) ("Selby Memorandum").

[5] The State Department also disputes Congress's view, expressed in the text of section 129(e) and section 503, that issuing multiple passports to accommodate travel to the Middle East constitutes a practice of "acquiesc[ing] in" or "comply[ing] with" the Arab League policy. Selby Memorandum at 2. In State's view, the issuance of multiple passports is "rather a challenge to [that policy], because the rules of the boycott forbid the use of second passports to evade the policy." *Id.* Nevertheless, the State Department recognizes that "Congress considers the issuance of second passports as compliance with the Arab League policy." *Id.*

[6] Option (1) was rejected because travel without a passport "would probably not be permitted by receiving states, would adversely impact U.S. bilateral relations in the region, and, if permitted, would expose U.S. officials to unacceptable personal risk." Selby Memorandum at 6. Option (2) was rejected because "even to propose it could adversely affect our relations with Israel, and, in any event, any such request would likely be rejected by Israel." *Id.* Option (3) was unacceptable because it "would put our diplomatic travel at

Continued

20

> Thus, in order to carry out [the single-passport requirement] in all cases, the President would have to make the abolition of the Arab League passport policy the first item on his negotiating agenda and succeed in having that policy abolished before proceeding with substantive negotiations of great importance to all parties concerned. . . . [W]e believe that such an effort would not succeed at this time.

*Id.* We defer to the State Department's expertise with respect to the practical effects of section 129(e) and 503 and concur in its legal conclusions.

## II.

The necessary background for our analysis of the particular issues presented here is the well-settled recognition of the President's broad authority over the Nation's foreign affairs. That authority flows from his position as head of the unitary Executive and as Commander-in-Chief. *See, e.g.,* U.S. Const. art. II, §§ 1-3; *Haig v. Agee,* 453 U.S. 280, 291-92 (1981); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319-20 (1936). In addition, Section 2 of Article II of the Constitution specifically grants the President the "Power . . . to make Treaties" and to "appoint Ambassadors, other public Ministers and Consuls." These constitutional provisions authorize the President to determine the form and manner in which the United States will maintain relations with foreign nations and to direct the negotiation of treaties and agreements with them. *See Issues Raised by Foreign Relations Authorization Bill,* 14 Op. O.L.C. 37 (1990) ("Barr Memorandum").

In exercising the "federal power over external affairs," the President is not subject to the interference of Congress:

> [T]he President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As [John] Marshall said in his great argument of March 7, 1800, in the House of Representatives, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations."

---

⁶(....continued)

the pleasure of Arab governments." *Id.* The *State Department* concluded that option (4) would cause "logistical problems" and might be viewed as inconsistent with the legislation. *Id.* Finally, option (5) was rejected because it would be "unacceptable to Israel" and because it would "only resolve the problem for a single trip." *Id.* More importantly, "it would be impossible in complex negotiations involving rapid, repeated travel between Israel and Arab countries." *Id.*

*Curtiss-Wright*, 299 U.S. at 319 (quoting 10 Annals of Cong. 613 (1800)) (emphasis in original). In other words, the President possesses "very delicate, plenary and exclusive power . . . as the sole organ of the federal government in the field of international relations." *Id.* at 320. *See also* Barr Memorandum, 14 Op. O.L.C. at 38-39.

The President himself emphasized these principles in his signing statement on Pub. L. No. 102-138:

> Article II of the Constitution confers the Executive power of the United States on the President alone. Executive power includes the authority to receive and appoint ambassadors and to conduct diplomacy. Thus, under our system of government, all decisions concerning the conduct of negotiations with foreign governments are within the exclusive control of the President. . . .
>
> The Constitution . . . vests exclusive authority in the President to control the timing and substance of negotiations with foreign governments and to choose the officials who will negotiate on behalf of the United States.

Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993, II Pub. Papers 1344 (Oct. 28, 1991) ("Presidential Signing Statement").

From the Executive's plenary authority to conduct the Nation's foreign affairs flow a number of specific executive powers that are of particular relevance to the issue at hand. These include control over the issuance of passports, power to determine the content of communications with foreign governments, authority to conduct diplomacy, and authority to define the content of foreign policy. As we explain in more detail below, we conclude that the infringement on these powers worked by section 129(e) and section 503 would be unconstitutional.

First, these provisions conflict with the long-accepted principle that the President, through delegates of his choosing, has authority over issuance of passports for reasons of foreign policy or national security. Prior to the enactment of the first passport legislation, it was generally understood that the

> issuance of a passport was committed to the sole discretion of the Executive and that the Executive would exercise this power in the interests of the national security and foreign policy of the United States. This derived from the generally accepted view that foreign policy was the province and responsibility of the Executive.

*Haig*, 453 U.S. at 293.

From the outset, "Congress endorsed not only the underlying premise of Executive authority in the areas of foreign policy and national security, but also its specific application to the subject of passports." *Id.* at 294. In the earliest passport statutes, Congress expressly recognized the Executive's authority in that regard. *See, e.g.,* Act of Feb. 4, 1815, ch. 31, § 10, 3 Stat. 195, 199 (prohibiting travel to enemy country without passport issued by officer "authorized by the President"). Passport legislation enacted in 1856, which authorized the Secretary of State to grant and issue passports "under such rules as the President shall designate and prescribe," reinforced the established power of the Executive in this area. *See Haig,* 453 U.S. at 294 (citing Act of Aug. 18, 1856, ch. 127, § 23, 11 Stat. 52, 60). As noted by the 1960 Congress, the 1856 Act

> merely confirmed an authority already possessed and exercised by the Secretary of State. . . . This authority was ancillary to his broader authority to protect American citizens in foreign countries and was necessarily incident to his general authority to conduct the foreign affairs of the United States under the Chief Executive.

Staff of Senate Comm. on Government Operations, 86th Cong., 2d Sess., *Reorganization of the Passport Functions of the Department of State* 13 (Comm. Print 1960) (*"Passport Reorganization"*). The Passport Act of 1926, ch. 772, 44 Stat. 887, adopted the pertinent language of the 1856 Act. The legislative history of the 1926 Act indicates congressional recognition of Executive authority with respect to passports. *See Validity of Passports: Hearings on H.R. 11947 Before the House Comm. on Foreign Affairs,* 69th Cong., 1st Sess. 5, 10-11 (1926). As the 1960 Senate staff report concluded: "[T]he authority to issue or withhold passports has, by precedent and law, been vested in the Secretary of State as a part of his responsibility to protect . . . what he considered to be the best interests of the Nation." *Passport Reorganization* at 13.

Executive action to control the issuance of passports in connection with foreign affairs has never been seriously questioned. For example, in 1861, the Secretary of State issued orders prohibiting persons from departing or entering the United States without passports, denying passports to individuals who were subject to the military service unless they were bonded, and denying passports to individuals who were engaged in activities that threatened the Union. *See* 3 John Bassett Moore, *A Digest of International Law* 920 (1906). In 1903, President Theodore Roosevelt promulgated a rule authorizing the Secretary of State to refuse to issue passports to persons who the Secretary believed desired a passport "to further an unlawful or improper

23

purpose." Exec. Order No. 235, § 16 (1903), *quoted in* Moore at 902.[7] On a number of occasions the President, acting through the Secretary of State, has exercised his foreign affairs power by refusing to issue a passport or by revoking one already issued. For example, in 1948, the Secretary of State, pursuant to his "discretionary authority . . . to conduct and be responsible for foreign policy," refused to issue a passport to a congressman who sought to go abroad to attend a Paris conference to aid Greek guerrilla forces. *Passports Again an Issue*, N.Y. Times, Apr. 11, 1948, at E9, *discussed in Haig*, 453 U.S. at 302.

More recently, the Supreme Court upheld the authority of the Secretary of State to revoke a passport on grounds of national security pursuant to a regulation, 22 C.F.R. § 51.70(b)(4) (1991), promulgated under section 1 of the Passport Act of 1926, codified as amended at 22 U.S.C. § 211a. *See Haig*, 453 U.S. at 289-310. Although *Haig* was decided on statutory grounds, *id.* at 289 n.17, the Supreme Court noted with approval the vesting of authority over passports in the Executive based on the Executive's constitutional authority in the area of foreign affairs, *id.* at 294.[8] By purporting to regulate the issuance of official and diplomatic passports, section 129(e) and section 503 infringe upon this constitutional authority.

Second, section 129(e) and section 503 would interfere with the President's communications to foreign governments in the conduct of the business of the United States Government abroad. In interfering with the issuance of official and diplomatic passports, Congress infringes on the President's plenary authority "to speak or listen as a representative of the nation." *Curtiss-Wright*, 299 U.S. at 319.

In general, passports are representations by the President to a foreign government on behalf of the United States. *See Haig*, 453 U.S. at 292 ("A passport is . . . a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer."); *id.* (quoting *Urtetiqui v. D'Arcy*, 34 U.S. (9 Pet.) 692, 698 (1835)) ("'[A passport] is a document, which, from its nature and object, is addressed to foreign powers . . . and is to be considered rather in the character of a political document . . . .'")

More particularly, official and diplomatic passports are documents addressed to foreign powers in which the President vouches for United States officials and diplomats.[9] They carry the Secretary of State's endorsement: "The bearer is abroad on an official [or diplomatic] assignment for the Government of the

---

[7] *See also* Exec. Order No. 654 (1907); Exec. Order No. 2119-A (1915); Exec. Order No. 2519-A (1917)

[8] *Haig v. Agee* provides two other examples of Executive authority over passports. In 1954, the Secretary revoked a passport held by an individual who was involved in supplying arms to foreign groups whose interests were contrary to United States policy. *Id.* at 302. Similarly, in 1970, the Secretary revoked passports held by two persons who sought to travel to the site of an international airplane highjacking. *Id.*

[9] State Department regulations describe the types of passports issued by the United States Government:
> (a) *Regular passport.* A regular passport is issued to a national of the United States proceeding abroad for personal or business reasons.
> (b) *Official passport.* An official passport is issued to an official or employee of the

Continued

United States of America." According to the Passport Office of the State Department, such passports have at least two purposes:

> (1) to represent to the foreign government that the bearer is in fact an official or employee of the United States Government proceeding abroad on [United States Government] business; [and] (2) to facilitate the accomplishment of that business (clothing diplomats with diplomatic immunity, by issuing a separate diplomatic passport falls within this category.)

Memorandum for Harry L. Coburn, Deputy Assistant Secretary for Passport Services, from William B. Wharton, Director, Office of Citizenship Appeals and Legal Services at 4-5 (Sept. 21, 1984).

Because of the communicative nature of official and diplomatic passports, section 129(e) and section 503 may be read as an attempt to dictate to the President the scope of permissible communications with foreign governments by means of passports. They would prevent him from issuing, in the case of a United States official or diplomat who has visited Israel, "a letter of introduction," *Haig*, 453 U.S. at 292, to Arab League nations that does not also document the bearer's visit to Israel. Indeed, in certain cases, the single-passport requirement might positively compel the President to issue, on behalf of government officials and diplomats, letters of introduction that would offend the recipients and cause the bearers to be turned away or subjected to retaliation and harassment. For example, the State Department predicts that "U.S. officials travelling to the Middle East could be expected to face obstacles to their entry to many Arab League countries if their passports reflect travel to Israel." Selby Memorandum at 5 (footnote omitted). Just as Congress may not directly intrude upon the President's "power to speak . . . as a representative of the nation," *Curtiss-Wright*, 299 U.S. at 319, it cannot indirectly, by means of section 129(e) and section 503, effect the same intrusion.

Third, the single-passport requirement would impair the President's ability to conduct foreign affairs by denying his diplomats the documentation necessary for entry into certain Arab League nations. It has long been recognized that "[a]s 'sole organ' [of the federal government in the field of international relations], the President determines also how, when, where and by whom the United States should make or receive communications, and there is nothing to suggest that he is limited as to time, place, form, or forum." Louis

---

[9](....continued)

United States Government proceeding abroad in the discharge of official duties. . . .

(c) *Diplomatic passport*. A diplomatic passport is issued to a Foreign Service Officer, [to] a person in the diplomatic service or to a person having diplomatic status either because of the nature of his or her foreign mission or by reason of the office he or she holds. . . .

22 C.F.R. § 51.3 (1991).

Henkin, *Foreign Affairs and the Constitution* 47 (1972). Section 129(e) and section 503 impermissibly attempt to limit the President's authority to make such determinations.

Congress itself has given heed to these principles since the founding of the Republic. As the Supreme Court has noted, the Senate Committee on Foreign Relations declared in 1816:

> The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. For his conduct he is responsible to the Constitution. The Committee consider this responsibility the surest pledge for the faithful discharge of his duty. They think the inference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety.

*Curtiss-Wright*, 299 U.S. at 319 (quoting 8 Reports of the Sen. Committee on Foreign Relations 24 (1916)).

It is clear that the single-passport requirement would interfere with, and perhaps foreclose altogether, the President's ability to conduct diplomacy involving certain Arab League countries. The policy of these countries is to deny entrance to those persons whose passports reflect previous travel to Israel. *See* H.R. Conf. Rep. No. 238 at 107.[10] The State Department believes that "[b]ased on prior experience and recent efforts to have the [Arab League policy] repealed, . . . at least in some instances the [policy] will be enforced against U.S. officials." Selby Memorandum at 12. The State Department has avoided the application of this policy to United States official and diplomatic personnel by issuing dual official or diplomatic passports to United States government employees whose responsibilities require travel to both Israel and Arab League nations. *See id.* at 4; *The Anti-Boycott Passport Act of 1991: Hearings Before the Subcomm. on International Operations of the House Comm. on Foreign Affairs*, 102d Cong., 1st Sess. 48, 54, 67 (1991) (testimony of Elizabeth M. Tamposi, Assistant Secretary of State, Bureau of Consular Affairs). To date, "[t]his practice has been successful in keeping the Arab travel boycott from interfering with the conduct of U.S. diplomacy in the region and from raising bilateral tensions." Selby Memorandum at 4.

If official and diplomatic personnel were forced to carry only a single

---

[10] In addition, the State Department advises that certain non-Arab League countries with large Muslim populations, such as Senegal, have occasionally refused to honor travel documents that reflect travel to Israel. Selby Memorandum at 5 n.2.

passport, they would face barriers to entering these Arab countries if they had visited Israel anytime within the period of the passport's validity — a period as long as five years. *See* 22 C.F.R. § 51.4(c), (d) (1991).[11] State Department officials have predicted that — at the very least — the single-passport requirement is likely to result in "incidents of reciprocation, retaliation and harassment of both officials and Congressmen, . . . either as a matter of policy in certain countries or simply as a manifestation of anti-Israeli zealousness among airport officials." U.S. Dep't of State, *The Operational Impact of Anti-Boycott Passport Legislation* 3 (June 17, 1991). In addition, "[q]uite apart from the question of entry, difficulties might also arise when an individual bearing evidence of prior or future travel to Israel is stopped at one of the many internal checkpoints in Lebanon and other Arab countries, and asked to produce a passport. At this juncture, evidence of travel to Israel might spark other, more serious, problems than denial of any entry visa." Selby Memorandum at 5. Such difficulties would clearly "interfere with the ability of United States officials to engage in diplomacy and could upset delicate and complex negotiations" and "would place our officials at personal risk." *Id.* As the President similarly declared in his signing statement on Pub. L. No. 102-138:

> A purported blanket prohibition on the issuance of more than one official or diplomatic passport to U.S. Government officials could interfere with my ability to conduct diplomacy by denying U.S. diplomats the documentation necessary for them to travel to all countries in the Middle East and could upset delicate and complex negotiations.

Presidential Signing Statement at 1344-45.[12]

Finally, Congress declared in section 129 that it was "the purpose of this section . . . to prohibit United States Government acquiescence in" the Arab

---

[11] The authority of the President to grant exceptions for citizens to enter or depart the United States without a passport *see* 8 U.S.C. § 1185(b), would not overcome these barriers imposed by the operation of section 129(e) and section 503. By its terms, section 1185(b) applies only to travel to and from the United States. It would have no effect on the ability of the President's representatives to gain entry into a foreign country.

[12] As the State Department has noted, the single-passport requirement, had it been in effect, might have upset the recent negotiations leading up to the long-sought Middle East Peace Conference. Memorandum for Brent Scowcroft, from Robert W. Pearson, Executive Secretary, Department of State, *Re: Proposed Legislation Prohibiting Multiple Official or Diplomatic Passports* at 2 (Oct. 29, 1991). In addition to the Secretary of State himself, other State Department personnel were involved in shuttle diplomacy between Israel and the Arab League nations of Jordan, Syria, Egypt, and Saudi Arabia, among others. The single-passport requirement would have disrupted the intensified travel necessary to facilitate the peace conference process. *Id.* Similarly, the complex process of obtaining the release of the American hostages in Lebanon might have been imperiled if United States diplomats were unable to make responsive consultations with Israeli and Arab League diplomats because of a single-passport requirement. In general, "to carry out [the requirement] in all cases, the President would have to . . . [postpone] substantive negotiations of great importance to all parties concerned." Selby Memorandum at 6.

27

League passport and visa policy. Section 129(a)(2), 105 Stat. at 661. To the extent that the single-passport requirement is an attempt, by indirect means, to dictate the substance of United States policy toward Arab League governments, it suffers from an additional constitutional defect. As the "'sole organ of the nation in its external relations,'" *Curtiss-Wright*, 299 U.S. at 319 (quoting 10 Annals of Cong. 613 (statement of Rep. John Marshall)), it is for the President alone to articulate the content of the Nation's response to the Arab League passport policy. By interfering with the President's foreign policy determinations, section 129(e) and section 503 attempt to intrude into a sphere in which the Constitution gives Congress no role. *See* Barr Memorandum, 14 Op. O.L.C. at 41.

In sum, the single-passport requirement interferes with the "plenary and exclusive" power of the President to conduct foreign affairs. The current policy of issuing more than one passport to officials of the United States Government traveling to the Middle East is a proper exercise of that power. Into this field, "the Senate cannot intrude; and Congress itself is powerless to invade it." *Id.* Thus, to the extent that section 129(e) and section 503 would interfere with the President's ability to conduct diplomacy with certain nations and limit the content and nature of his speech to foreign governments as the representative of the United States by limiting issuance of official and diplomatic passports, they do not comport with the Constitution.[13]

That section 503 was enacted as a condition on the appropriation of money for the State Department does not save it from constitutional infirmity. As we have said on several prior occasions, Congress may not use its power over appropriation of public funds "to attach conditions to Executive Branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs. . . . [T]he President cannot be compelled to give up

---

[13] This analysis has proceeded from the President's broad authority over the Nation's foreign affairs and has relied on specific applications of that authority. The analysis applies self-evidently to the issuance of diplomatic passports, which are furnished to Foreign Service Officers, persons in the diplomatic service, and persons having diplomatic status due to their missions or offices. *See* 22 C.F.R. § 51.3(c) (1991), *quoted supra* note 9. The Department of State has also asked for our views on the constitutionality of the single passport requirement "as applied to non-Executive branch officials, such as members of Congress and the federal judiciary, who often carry diplomatic passports, and Congressional staff, who frequently travel on official passports." Selby Memorandum at 14. We have received the informal advice of the State Department that it believes the provisions are also unconstitutional as applied to these non-executive branch officials. Telephone Conversation between Jamison M. Selby, Deputy Legal Adviser, Department of State, and Timothy E. Flanigan, Acting Assistant Attorney General, Office of Legal Counsel (Jan. 17, 1992).

Without the benefit of the State Department's formal views on this question, we offer the following views. To the extent that members of the legislative and judicial branches travel on diplomatic passports our analysis, of course, applies to such passports. In general, we also believe that the President's authority over foreign affairs applies equally to the issuance of official passports. To receive an official passport, a person must be "an official or employee of the United States Government proceeding abroad in the discharge of official duties." 22 C.F.R. § 51.3(b) (1991), *quoted supra* note 9. Such persons are necessarily representing the United States in its dealings with foreign nations. Indeed, they travel with the Secretary of State's endorsement that they are "abroad on an official assignment for the Government of the United States of America." Accordingly, we believe that our analysis would apply with equal force to all officials passports, whether issued to members of the executive branch or to members of a coordinate branch.

28

the [constitutional] authority of his Office as a condition of receiving the funds necessary to carrying out the duties of his Office.'" Barr Memorandum, 14 Op. O.L.C. at 42 n.3 (quoting *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261-62 (1989)).

The Supreme Court has recently endorsed this conclusion. In some spheres, it has said, "the constitutional limitations on Congress when exercising its spending power are less exacting than those on its authority to regulate directly." *South Dakota v. Dole*, 483 U.S. 203, 209 (1987); *cf.* U.S. Const. art. I, § 8, cl. 1. But in *Metropolitan Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 271 (1991), the Supreme Court found *Dole* "inapplicable" to issues (such as those raised by section 129(e) and section 503) that "involve separation-of-powers principles." In accordance with this decision, therefore, our analysis is not affected by the fact that the single-passport requirement of section 503 is in the form of a condition on appropriation.[14]

For all these reasons, we conclude that section 129(e) and section 503 are unconstitutional to the extent that they purport to limit the President's ability to issue more than one official or diplomatic passport to United States government personnel.

### III.

We now turn to the question whether section 129(e) and section 503 may be severed from the authorization act and the appropriations act.

The Supreme Court has explained the basic approach to severability questions on many occasions: "Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Ref. Co. v. Corporation Comm'n*, 286 U.S. 210, 234 (1932), *quoted in Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). Thus, absent evidence that the statute without the unconstitutional provisions will not function "in a *manner* consistent with the intent of Congress," *Alaska Airlines*, 480 U.S. at 685, the unconstitutional provision will be found to be severable.

The single-passport requirement of section 129(e) operates independently of the remainder of Pub. L. No. 102-138, which contains 144 substantive sections related to one another only by the fact that they involve some aspect of foreign relations. *See, e.g.*, § 121 ("Childcare Facilities at Certain Posts Abroad"); § 225 ("Eastern Europe Student Exchange Endowment Fund"); § 301 ("Persian Gulf War Criminals"); § 359 ("Human Rights Abuses

---

[14] The State Department agrees that "if Congress cannot directly prohibit the issuance of multiple diplomatic passports, it cannot do so indirectly through its appropriations power." Selby Memorandum at 13 (emphasis and capitalization omitted).

in East Timor"); § 402 ("Multilateral Arms Transfer and Control Regime"); § 507 ("Sanctions Against Use of Chemical or Biological Weapons"). There is no textual evidence that Congress would not have enacted this wide-ranging bill if the isolated provision regarding issuance of multiple passports had not been included.[15] Nothing in the legislative history undermines this conclusion.[16] The absence of section 129(e), moreover, would in no way impair the execution of the remainder of the statute in a manner fully consistent with the intent of Congress. There is, in short, no reason to conclude that Congress would have declined to enact Pub. L. No. 102-218 had it known that section 129(e) would not pass constitutional muster. We therefore conclude that the single-passport requirement is severable from the remainder of Pub. L. No. 102-138.

The appropriations bill, Pub. L. No. 102-140, contains an express severability clause. Section 604 provides:

> If any provision of this Act or the application of such provision to any person or circumstances shall be held invalid, the remainder of the Act and the application of each provision to persons or circumstances other than those as to which it is held invalid shall not be affected thereby.

105 Stat. at 823. The Supreme Court has held that the inclusion of a severability clause "creates a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision. In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute." *Alaska Airlines*, 480 U.S. at 686 (citations omitted). In the case of Pub. L. No. 102-140, there is no strong evidence — indeed, there is no evidence at all — that Congress intended the validity of the statute to depend on the validity of section 503. The single-passport

---

[15] The absence of a severability provision is not dispositive, for "[i]n the absence of a severability clause . . . , Congress' silence is just that — silence — and does not raise a presumption against severability." *Alaska Airlines*, 480 U.S. at 686.

[16] The Senate Foreign Relations Committee gave this provision no special attention that would indicate its centrality to the legislation as a whole. The portion of the Committee's 134-page report devoted to what later became section 129 consumed only a single page, and was merely a synopsis of the provision's text. *See* S. Rep. No. 98, 102d Cong., 1st Sess. 55 (1991). The House bill did not even contain a single-passport requirement. *See* H.R. Rep. No. 53, 102d Cong., 1st Sess. 62 (1991).

On the Senate floor, the Chairman of the Foreign Relations Committee (Senator Pell) did not mention the single-passport requirement as he summarized the bill, *see* 137 Cong. Rec. S11,121 (daily ed. July 29, 1991) and only one speaker discussed the passport provision. *See id.* at S11,189-90 (statement of Sen. Lautenberg).

The conference committee adopted almost verbatim the language of the Senate bill. *See* H R. Conf. Rep. No. 238 at 107. The conferees devoted no more attention to section 129 than to many other provisions. Nor did the conferees give any indication that this provision of the bill was so central to its adoption that the bill would fail without it.

When the bill came back from conference, the passport provision merited only a single sentence of discussion on the Senate floor. *See* 137 Cong. Rec. S14,438 (daily ed. Oct. 4, 1991) (statement of Sen. Kerry). In the House, the Democratic floor manager spoke about the provision at greater length, but gave no indication that it was in any sense the keystone of the entire bill. *See* 137 Cong. Rec. H7638 (daily ed. Oct. 8, 1991) (statement of Rep. Berman).

requirement did not even appear in the House bill, but was added by the Senate. *See* S. Rep. No. 106, 102d Cong., 1st Sess. 114 (1991). The Conference Report did not discuss the provision at all. *See* H.R. Conf. Rep. No. 233, 102d Cong., 1st Sess. 87 (1991) (noting only that the Senate's amendment adding the single-passport requirement was "[r]eported in disagreement"). Finally, the respective committee reports gave no indication that the severability clause was to be given anything but its natural construction. *See* S. Rep. No. 106, at 123; H.R. Rep. No. 106, 102d Cong., 1st Sess. 97 (1991).[17]

Thus, we conclude that the single-passport requirements of Pub. L. No. 102-138 and Pub. L. No. 102-140 are severable from the remainder of those bills.

## IV.

The final issue we address is whether the President may refuse to enforce the single-passport requirements.[18] The Department of Justice has consistently advised that the Constitution provides the President with the authority to refuse to enforce unconstitutional provisions.[19] Both the President's obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and the President's oath to "preserve, protect and defend the Constitution of the United States," *id.* § 1, vest the President with the responsibility to decline to enforce laws that conflict with the highest law, the Constitution. We recognize, however, that the judicial authority addressing this issue is sparse and that our position may be controversial.

Among the laws that the President must "take Care" to faithfully execute is the Constitution. This proposition seems obvious, since the Constitution is "the supreme *Law* of the Land." U.S. Const. art. VI, § 2 (emphasis added). As the Justice Department has stated previously,

> the Executive's duty faithfully to execute the law embraces a duty to enforce the fundamental law set forth in the Constitution as well as a duty to enforce the law founded in the Acts

---

[17] Although the severability clause of Pub. L. No. 102-140 is couched in terms of provisions of the act being "held to be invalid," and thus arguably might be read to contemplate a court decision on validity of portions of the act, it remains an accurate indicator of whether Congress would have enacted the bill, and desired its other provisions to stand, if any particular section were not enforced.

[18] The analysis of this question does not turn on the fact that the President has signed the two bills. As the Supreme Court has observed, "it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds." *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983). That the President has signed a bill in no way estops him from later asserting the bill's unconstitutionality, in court or otherwise. *See* Letter for Peter W. Rodino, Jr., Chairman, House Committee on the Judiciary, from William French Smith, Attorney General at 3 (Feb. 22, 1985) ("Attorney General Smith Letter") ("[T]he President's failure to veto a measure does not prevent him subsequently from challenging the Act in court, nor does presidential approval of an enactment cure constitutional defects."); Memorandum for Robert J. Lipshutz, Counsel to the President, from John M Harmon, Assistant Attorney General, Office of Legal Counsel at 1 (Sept 27, 1977) ("Harmon Memorandum") ("[P]rior to a definitive judicial determination of the question of constitutionality a President may decline to enforce a portion of a statute if he believes it to be unconstitutional, even if he or one of his predecessors signed the statute into law.").

[19] Our most recent consideration of this issue is set forth in the Barr Memorandum. The following discussion is drawn in large part from that memorandum.

31

of Congress, and cases arise in which the duty to the one precludes the duty to the other.

*Constitutionality of Congress' Disapproval of Agency Regulations by Resolutions Not Presented to the President*, 4A Op. O.L.C. 21, 29 (1980) (Opinion of Attorney General Benjamin R. Civiletti). *See also, e.g., Bid Protest Hearings* at 23 (statement of Professor Mark Tushnet) ("[T]he President is required faithfully to execute the laws of the United States, which surely include the Constitution as supreme law."). Where an act of Congress conflicts with the Constitution, the President is faced with the duty to execute conflicting "laws" -- a constitutional provision and a contrary statutory requirement. The resolution of this conflict is clear: the President must heed and execute the Constitution, the supreme law of our Nation.

Thus, the Take Care Clause does not compel the President to execute unconstitutional statutes. An unconstitutional statute, as Chief Justice Marshall explained in his archetypal decision, is simply not a law at all: "Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that *an act of the legislature, repugnant to the constitution, is void.*" *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). As Alexander Hamilton had previously explained, "[t]here is no position which depends on clearer principles than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the Constitution, can be valid." *The Federalist No. 78*, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961).[20] Obviously, if a statute is "void" or "no law," it cannot be one of the "Laws" that the President must faithfully execute.

We are aware that the Constitution provides that a bill enacted pursuant to the procedure described in article I, section 7 "shall become a Law." Only laws "made in Pursuance" of the Constitution, however, "shall be the supreme Law of the Land." U.S. Const. art. VI, § 2; *see also Marbury*, 5 U.S. (1 Cranch) at 180. In order to be a *valid* "Law," therefore, a statute must comport with the substance of the Constitution, as well as with its procedures. When confronted with a suggestion to the contrary, the Supreme Court dismissed it in a footnote: "The suggestion is made that [a

---

[20] This proposition is hardly a novel one. *See e.g.*, Frank H. Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905, 920 (1990) ("The Supreme Court has said more times than one can count that unconstitutional statutes are 'no law at all.'") (citing *Norton v. Shelby County*, 118 U.S. 425, 442 (1886) ("An unconstitutional act is not a law; . . . it is, in legal contemplation, as inoperative as though it had never been passed.")); Letter for Gerrit Smith, from Salmon P. Chase, Chief Justice of the United States (Apr. 19, 1868) *quoted in* J.W. Schuckers, *The Life and Public Services of Salmon Portland Chase* 577 (1874) ("Chief Justice Chase Letter") ("Nothing is clearer to my mind than that acts of Congress not warranted by the Constitution are not laws."); *Appointment of Assistant Assessors of Internal Revenue*, 11 Op. Att'y Gen. 209, 214 (1865) ("If any law be repugnant to the Constitution, it is void; in other words, it is no law ").

legislative veto provision] is somehow immunized from constitutional scrutiny because the Act containing [the provision] was passed by Congress and approved by the President. *Marbury v. Madison* resolved that question." *Chadha*, 462 U.S. at 942 n.13 (citation omitted).

The President's constitutional oath of office is further authority for the President to refuse to enforce an unconstitutional law. The Constitution requires the President to take an oath in which he promises to "preserve, protect and defend the Constitution of the United States." U.S. Const. art. II, § 1. As Chief Justice Chase asked, "How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no *right* to *defend* it against an act of Congress sincerely believed by him to have been passed in violation of it?" Chief Justice Chase Letter at 578. He had already answered the question: "[I]n the case where [an act of Congress] directly attacks and impairs the Executive power confided to him by the Constitution . . . it seems to me to be the clear duty of the President to disregard the law . . . ." *Id.* at 577. Just as the Take Care Clause requires the President to faithfully execute the laws, including the Constitution as the supreme law, the oath to defend the Constitution allows the President to refuse to execute a law he believes is contrary to that document.

Although the Supreme Court has not squarely addressed the issue, four Justices have recently endorsed the proposition that a President may decline to enforce unconstitutional laws. In *Freytag v. Commissioner*, 501 U.S. 868 (1991), Justice Scalia, in an opinion joined by Justices O'Connor, Kennedy, and Souter, observed that "the means [available to a President] to resist legislative encroachment" upon his power included "the power to veto encroaching laws, *or even to disregard them when they are unconstitutional.*" *Id.* at 906 (Scalia, J., concurring in part and concurring in the judgment) (citation omitted and emphasis added). The Court's opinion did not take issue with this observation.[21]

Justice Scalia's opinion is the latest in a long line of authority dating back to the framing of the Constitution. For instance, James Wilson, a key drafter and advocate for the ratification of the Constitution, addressed the President's authority to refuse to enforce unconstitutional laws in the Pennsylvania ratifying convention. He equated Presidential review of statutes with judicial review:

> I had occasion, on a former day . . . to state that the power of
> the Constitution was paramount to the power of the legisla-
> ture, acting under that Constitution. For it is possible that the

---

[21] The Supreme Court has considered several controversies that arose because of a President's decision to ignore statutes that he believed were unconstitutional without suggesting that the President had acted illegitimately. For example, as Attorney General Benjamin R. Civiletti has observed, the Court in *Myers v. United States*, 272 U.S. 52 (1926), upheld the President's decision to fire a postmaster despite a statute preventing him from doing so and did not question the propriety of the President's action that gave rise to the case before it. *See The Attorney General's Duty to Defend and Enforce Constitutionally Objectionable Legislation*, 4A Op. O.L.C. 55, 59 (1980)

legislature . . . may transgress the bounds assigned to it, and an act may pass, in the usual *mode*, notwithstanding that transgression; but when it comes to be discussed before the judges — when they consider its principles and find it to be incompatible with the superior power of the Constitution, it is their duty to pronounce it void. . . . *In the same manner, the President of the United States could shield himself and refuse to carry into effect an act that violates the Constitution.*

II *The Documentary History of the Ratification of the Constitution* 450-51 (Merrill Jensen ed., 1976) (statement of Dec. 1, 1787) (second emphasis added).

Wilson's understanding illustrates the Framers' profound structural concern about the threat of legislative encroachments on the Executive and the Judiciary. James Madison observed that "[t]he legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." *The Federalist No. 48*, at 309 (James Madison) (Clinton Rossiter ed., 1961). The Supreme Court has said that: "the hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *Chadha*, 462 U.S. at 951. Presidential decisions not to enforce statutes that violate the separation of powers have been justified by the need to resist legislative encroachment. In 1860, for example, Attorney General Black advised President Buchanan that he could refuse to enforce an unconstitutional condition in a law:

> Congress is vested with legislative power; the authority of the President is executive. Neither has a right to interfere with the functions of the other. Every law is to be carried out so far forth as is consistent with the Constitution. . . . You are therefore entirely justified in treating this condition (if it be a condition) as if the paper on which it is written were blank.

*Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469-70 (1860).[22]

More recently, the Department of Justice, under both Democratic and Republican Administrations, has consistently advised that the Constitution authorizes the President to refuse to enforce a law that he believes is unconstitutional. Thus, Attorney General Smith explained that the Department's decision not to enforce or defend the Competition in Contracting Act was

---

[22] *Cf.* Raoul Berger, *Executive Privilege: A Constitutional Myth* 309 (1974) ("Agreed that a veto exhausts presidential power when the issue is the *wisdom* of the legislation. But the object of the Framers was to prevent '*encroachment*' . . . . I would therefore hold that the presidential oath to 'protect and defend the Constitution' posits both a right and a duty to protect his own constitutional functions from congressional impairment.").

> based upon the fact that in addition to the duty of the President to uphold the Constitution in the context of the enforcement of Acts of Congress, the President also has a constitutional duty to protect the Presidency from encroachment by the other branches. . . . An obligation to take action to resist encroachments on his institutional authority by the legislature may be implied from [his oath to "preserve, protect and defend" the Constitution] . . . .

Attorney General Smith Letter at 3; *see also* Letter for Thomas P. O'Neill, Jr., Speaker of the House, from Benjamin R. Civiletti, Attorney General at 3 (Jan. 13, 1981) ("[T]he Executive's independent [constitutional] obligation to 'take care that the laws be faithfully executed', permits the Attorney General not to initiate criminal prosecutions that will undoubtedly prove unsuccessful on constitutional grounds.") (citation omitted); Harmon Memorandum at 16 ("[T]he President's duty to uphold the Constitution carries with it a prerogative to disregard unconstitutional statutes.").

This Office has given the same advice, particularly when the statutes in question would blur the separation of powers between the Congress and the President, as do section 129(e) and section 503. *See, e.g.*, Harmon Memorandum at 13 ("We have said that *Myers [v. United States*, 272 U.S. 52 (1926)], by implication, stands for the proposition that the President may lawfully disregard a statute that trenches upon his constitutional powers. We would be disposed to accept that proposition even in the absence of *Myers*."); Memorandum for the Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel at 17 (Aug. 27, 1984) ("[T]he President need not blindly execute or defend laws enacted by Congress if such laws trench on his constitutional power and responsibility."). *See also* Barr Memorandum, 14 Op. O.L.C. at 49-50. The Department has consistently maintained that these principles apply whether or not the President signed the law that he intends not to enforce. *See supra* note 18.

We recognize that opponents of the specific Presidential authority to refuse to enforce unconstitutional statutes draw support for their views from the same constitutional texts we have cited, especially the Take Care Clause. *See, e.g.*, Arthur S. Miller, *The President and Faithful Execution of the Laws*, 40 Vand. L. Rev. 389, 396 (1987) ("To say that the President's duty to faithfully execute the laws implies a power to forbid their execution is to flout the plain language of the Constitution."); *Bid Protest Hearings* at 89 (letter of Professor Eugene Gressman) ("[I]t would be a novel and 'entirely inadmissible' construction of the Constitution to contend that the President's obligation to see the laws faithfully executed implies a power to forbid their execution."). These conclusions appear to rest on the argument that the executive branch is not the institution within the federal government that is authorized to determine whether a law is unconstitutional. Accordingly, Professor Gressman has stated that "despite a Presidential belief that a duly

enacted statute invades Executive powers, he must comply with and execute that statute *until it is definitively invalidated by the courts.*" *Id.* at 88 (emphasis added). As the Justice Department has acknowledged, "until a law is adjudicated to be unconstitutional, the issue of enforcing a statute of questionable constitutionality raises sensitive problems under the separation of powers." *Id.* at 318-19 (statement of Acting Deputy Attorney General D. Lowell Jensen).

We reject, however, the argument that the President may not treat a statute as invalid prior to a judicial determination, but rather must presume it to be constitutional. This would subtly transform the proposition established in *Marbury v. Madison* -- in deciding a case or controversy, the Judiciary must decide whether a statute is constitutional -- to the fundamentally different proposition that a statute conflicts with the Constitution *only* when the courts declare so. Professor Sanford Levinson explained why this cannot be so:

> If one believes that the judiciary "finds" the [law] instead of "creating" it, then the law is indeed "unconstitutional from the start." Indeed, the judicial authority under this view is derived from its ability to recognize the constitutionality or unconstitutionality of laws, but, at least theoretically, the constitutional status [of statutes] is independent of judicial recognition. To argue otherwise is ultimately to adopt a theory that says that the basis of law — including a declaration of unconstitutionality — is the court's decision itself. Among other problems with this theory is the incoherence it leads to in trying to determine what it can mean for judges to be faithful to their constitutional oaths.

*Bid Protest Hearings* at 67.

Still others have argued that the veto power is the only tool available to the President to oppose an unconstitutional law. Although we recognize that the veto power is the primary tool available to the President; we disagree with the contention that the Framers intended it to be the only tool at the President's disposal. James Wilson's statement, quoted above, demonstrates that the idea that the President has the authority to refuse to enforce a law he believes is unconstitutional was familiar to the Framers. The Constitution limits the President's formal power in the legislative process to the exercise of a qualified veto, but it places no limit on his authority to take care that the laws are faithfully executed.[23]

---

[23] We emphasize that this conclusion does not permit the President to determine as a matter of policy discretion which statutes to enforce. The only conclusion here is that he may refuse to enforce a law that

Continued

36

# Conclusion

For the reasons given above, we conclude that section 129(e) of Pub. L. No. 102-138 and section 503 of Pub. L. No. 102-140 are unconstitutional to the extent that they purport to prohibit the issuance of more than one official or diplomatic passport to United States government officials. We also conclude that these provisions are severable, and that the President is constitutionally authorized to decline to enforce them.

TIMOTHY E. FLANIGAN
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[23] (....continued)

he believes to be *unconstitutional*.

    Given this distinction, the Supreme Court's decision in *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838), has no relevance to the question whether the President may refuse to enforce a law because he considers it unconstitutional. There, the Supreme Court states: "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.* at 613. The Court, however, took pains to deny that the President had made such an argument, as the case involved the Postmaster General's refusal, with no support from the President, to comply with a statute that ordered him to pay two contractors for mail carrying services. Because the case did not involve a claim by the President that he would not enforce an unconstitutional law, the Court had no occasion to examine the unique considerations presented by such a claim.